## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

KEVIN REGER,

      Plaintiff,

          v.                                 CASE NO. 3:16-CV-778-MGG

ARIZONA RV CENTERS, LLC, *et al.*,

      Defendants.

## OPINION AND ORDER

In August 2015, Plaintiff Kevin Reger ("Reger") purchased a 2015 Tuscany 44MT motorhome ("the RV") from Defendant Arizona RV Centers, LLC ("ARV") in Mesa, Arizona. The chassis of the RV was manufactured by non-party Freightliner and Defendant Thor Motor Coach, Inc. ("Thor") assembled the rest of the RV atop Freightliner's chassis. The RV came with limited warranties from both Thor and Freightliner. Reger also purchased an extended service plan ("ESP") for the RV. Soon after purchasing the RV, Reger discovered defects with the RV including but not limited to rust and corrosion throughout the vehicle and cracks in the roof among several other issues. To address all the issues arising from his purchase of the RV, Reger initiated this lawsuit against Thor and ARV on November 16, 2016, raising seven claims.[1]

---

[1] Reger's operative Third Amended Complaint also includes a Magnuson Moss Warranty Act claim for breach of implied warranty of merchantability against Thor. [DE 52 at 3–4]. Reger acknowledges in a footnote that the claim was previously dismissed by this Court on August 21, 2017, but that he is repleading the claim "solely to preserve his appellate rights." [*Id.* n.1]. This claim requires no further attention here.

In the operative Third Amended Complaint ("the Complaint"), Reger raises claims of breach of express warranty under the Magnuson Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.* (Count II); violation of the Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5 *et seq.* (Count III); and common law fraud (Count VIII) against Thor. As to ARV, Reger asserts claims of breach of implied warranty of merchantability (Count IV); revocation of acceptance (Count V); violation of the Arizona Consumer Fraud Act ("ACFA"), A.R.S § 44-1521 *et seq.* (Count VI); and common law fraud (Count VII). Thor and ARV now seek summary judgment on all claims.

This Court retains subject matter jurisdiction in this action under 28 U.S.C. § 1331 and 15 U.S.C. § 2310(d)(3)(B) based upon Reger's claims for breach of warranty under the MMWA with an amount in controversy that exceeds $50,000.[2] This Court has supplemental jurisdiction over Reger's remaining state law claims under 28 U.S.C. § 1367. And with consent of the parties pursuant 28 U.S.C. § 636(c)(1), the undersigned may enter a ruling in this matter. [DE 28]. For the following reasons, Thor's motion for summary judgment is granted in part and ARV's motion for summary judgment is granted in full.

## I.   RELEVANT BACKGROUND

The following facts are primarily not in dispute. Any disputed facts are either not material or will be addressed in the substantive analysis below.

---

[2] The parties agree that subject matter jurisdiction under 28 U.S.C. § 1332, based upon a diversity of citizenship of the parties, likely does not exist. [DE 102 at 1–2].

Reger is an Air Force veteran and a long-time businessman. In the Air Force, Reger performed aircraft maintenance. Among his early business endeavors was owning a mobile home park. He then became involved in real estate development and general contracting. Through his company in Illinois, Reger remains active in residential, commercial, and industrial property development. As part of his business, he deals regularly with assorted legal entities and contracts. He also negotiates contracts on his own before seeking advice of legal counsel.

Reger maintains a home in Managua, Nicaragua where he typically lives from October or November through May or June every year. The rest of the year, he lives in the United States residing in his RV. In August 2015, Reger visited ARV—also known as Camping World—to buy parts for an RV he owned. During that visit, another RV—the 2015 Tuscany 44MT—caught Reger's eye. He returned to ARV a few days later for a second look and a test drive. After negotiations with ARV on pricing and some exterior scratches, Reger purchased the RV for $282,999.00. On August 20, 2015, he secured financing for the RV and executed a Retail Installment Contract and Security Agreement ("RICSA") with ARV. Reger returned to ARV the next day to pick up the new RV when he also signed the final Purchase Agreement with ARV.

As is common throughout the RV industry, Reger's RV came with several warranties. First, the Purchase Agreement defined the scope of any warranty from ARV, including limitations or exclusions as to such warranties. Second, Thor and Freightliner provided limited warranties consistent with their respective roles in the manufacture of the RV. Having manufactured the powertrain and automotive chassis

3

frame of Reger's RV, Freightliner provided a limited warranty covering aspects of the chassis portion of the RV. Based upon its assembly of the "box" or house portion of the RV on top of the Freightliner chassis, Thor extended a written limited warranty covering defects in workmanship or materials, subject to a number of exclusions.

Shortly after his purchase, Reger noticed a host of problems with his RV, including some rust and corrosion. He returned the RV to ARV to resolve those issues. But as time passed, he discovered more problems and sought further repairs from ARV, Thor, and other RV dealers. He was told that some of the issues were not covered by warranty. Reger was dissatisfied with explanations he was given for the problems leading him to refuse certain repairs that were offered or even undo certain repairs performed. After some repairs he deemed unsuccessful, Reger returned to Thor in the spring of 2016 at which time he was told by a Thor representative that the Freightliner chassis had been left outside at the Thor facility for some time before Thor assembled the RV.

Given the continuing problems with his RV, Reger hired Mr. Phillip J. Grismer, an expert in transportation and marine appraisal, to inspect his RV. In early October 2016, Mr. Grismer inspected the RV and reviewed the purchase and repair documents provided by Reger. Mr. Grismer's resulting appraisal report attributed many of the RV's problems to Thor's allegedly defective extension of the chassis's frame rails when assembling the RV. Mr. Grismer also opined that the RV could not have been "new" at the time of purchase given the quantity and far-reaching scope of defects with the RV that he observed or heard about from Reger.

On October 29, 2016, Reger's attorney sent a letter on his behalf to both ARV and Thor attempting to revoke his acceptance of the RV and cancel his contracts with both entities. [DE 88-3]. The letter also notified ARV and Thor of alleged breaches of warranties, violations of consumer protection statutes, and fraudulent conduct. Without a satisfactory response from ARV or Thor, Reger initiated the instant lawsuit on November 16, 2016. With discovery complete, Thor and ARV filed the instant motions for summary judgment.

## II.   ANALYSIS

### A.   Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003).

Yet to overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the

nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex*, 477 U.S. at 322–23; *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

### B.    Thor's Motion for Summary Judgment [DE 79]

#### 1.    MMWA Breach of Express Warranty Claims (Count II)

##### a.    Choice of Law

Thor contends that Indiana law applies to Reger's Magnuson Moss Warranty Act ("MMWA") breach of express warranty claim. Thor's argument is surprising. In its motion to dismiss earlier in this litigation, Thor advocated for the application of Arizona law to Reger's warranty or contract claims, as well as his deceptive act or tort claims. [*Compare* DE 13 at 6–8, *with* DE 80 at 9, DE 95 at 1–2]. This Court then applied Arizona law to Reger's original implied warranty of merchantability claim without making any explicit finding as to the law applicable to Reger's original express warranty claim or even his original claim under the Indiana Deceptive Consumer Sales

Act ("IDCSA"). [DE 16 at 3–9]. Now Thor has challenged the application of Arizona law to the breach of express warranty claim. In response, Reger relies upon the same authority Thor once did to argue for application of Arizona law while Thor cites completely different authority for application of Indiana law without explanation for its shift in legal theory.

While it does not provide an independent basis for liability, the MMWA does provide federal jurisdiction for state breach of warranty claims such that liability under the MMWA arises out of state law. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Therefore, this Court must determine which state's substantive law[3] applies to Reger's MMWA breach of express warranty claim.

A federal court must apply the choice of law provisions from the state in which it sits. *Bailey v. Skipperliner Indus., Inc.*, 278 F. Supp. 2d 945, 951 (N.D. Ind. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Hence, this Court must apply Indiana's choice of law rules. In contract matters, Indiana follows the Restatement (Second) of Conflict of Laws. *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 931 (Ind. Ct. App. 1999). "If the parties have not made an effective choice of law, the court will consider the different contacts the parties have with the forums at issue." *Id.* (citing *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997), *trans. denied*.); *see also Large v. Mobile Tool Int'l, Inc.*, 724 F.3d 766, 771 (7th Cir. 2013). To identify the forum with the most intimate contacts relevant to a particular contract case,

---

[3] Regardless of which state's substantive law applies, federal procedural law applies to this case. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

courts consider "(a) the place of contracting, (b) the place of negotiation of the contract,

(c) the place of performance, (d) the location of the subject matter of the contract, and (e)

the domicil, residence, nationality, place of incorporation and place of business of the

parties." *Travelers Indem. Co.*, 715 N.E.2d at 931 (quoting *Dana Corp.* 690 N.E.2d at 291).

The fourth factor is typically given the most weight. *Large*, 724 F.3d at 771 (citing *Ky.*

*Nat'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 919 N.E.2d 565, 575 (Ind. Ct. App. 2010)).

"If the place of negotiating the contract and place of performance are in the same state,

the law of that state will usually be applied." *Bailey*, 278 F. Supp. 2d at 953 (quoting

Restatement (Second) of Conflict of Laws § 188 (1971)).

 In this case, Thor's Limited Warranty does not contain a choice of law provision.

[DE 90-4 at 42]. As a result, the parties' contacts with the fora at issue should determine

the applicable substantive law. *See Travelers Indem. Co.*, 715 N.E.2d at 931. Those

contacts favor Arizona. Specifically, the Limited Warranty was executed as part of the

sale of the RV to Reger by ARV in Arizona. Reger and Thor did not negotiate the terms

of Thor's Limited Warranty directly, but the Warranty was a variable presumably

considered when Reger negotiated the sales contract with ARV in Arizona. These two

facts alone point to application of Arizona law.

 Beyond that, however, Thor and ARV maintained a business relationship that

allowed ARV to sell Thor RVs in Arizona. Reger's RV was delivered to him in Arizona

once the sales contract with ARV was executed. Reger pursued some of the repairs to

the RV under the Thor Warranty in Arizona and others at Thor's facility in Indiana. As

a result, the parties' contacts in Arizona exceeded those in Indiana, which were limited

to the RV repairs at Thor and Thor's citizenship there.[4] The ongoing location of the RV does not tip the scales toward Indiana either as Reger moves the RV around the country without stops in Indiana but for repairs at Thor. Taken together, these factors demonstrate that Arizona has the most significant relationship to the transaction at the heart of this case and thus, that Arizona law should apply. *Cf. Shearer v. Thor Motor Coach, Inc.*, No. 3:19-CV-965-PPS-MGG, 2020 WL 3618795, at *6 (N.D. Ind. July 1, 2020) (finding Florida had more intimate contacts with similar RV case and then applying Florida substantive law to motion to dismiss).

Yet if "the parties do not identify a conflict between the bodies of state law that might apply to their dispute, courts apply the law of the forum state . . . ." *Swan Lake Holdings, LLC v. Yamaha Golf Cart Co.*, No. 3:09-CV-228-PPS, 2010 WL 3894576, at *3 (N.D. Ind. Sept. 27, 2010); *see also Ind. Ins. Co. v. Pana Cmty. Unit Sch. Dist.*, 314 F.3d 895, 900 (7th Cir. 2002). Here, both Indiana and Arizona have adopted the Uniform Commercial Code, which governs claims for breach of an express warranty. A.R.S. § 47-1101 *et seq.*; Ind. Code § 26-1-1-101. As such, Arizona and Indiana law do not appear to conflict leading Thor to argue for the first time—and in contrast with the *Bailey/Travelers* analysis it endorsed in its motion to dismiss—that no choice of law analysis is required and that Indiana law, as the law of the forum state, applies.

Further, Thor argues that any choice of law analysis deemed necessary would be governed by the UCC. Typically, choice of law questions in UCC cases are governed by

---

[4] Thor is an Indiana corporation with its principal place of business in Indiana while Reger is domiciled either in Illinois or Nicaragua. [*See* DE 102 at 1–2, ¶ 1].

Ind. Code § 26-1-1-301." See *Jameson Chem. Co. v. Love*, 401 N.E.2d 41, 44 (Ind. Ct. App.),

*modified on other grounds,* 403 N.E.2d 928 (Ind. Ct. App. 1980). Indiana Code § 26-1-1-301

states that in the absence of agreement among the parties as to which sovereign's law

shall govern their rights and duties, the Indiana UCC "applies to transactions bearing

an appropriate relation to Indiana." Thor contends that the transaction at issue here

bears an appropriate relation to Indiana because the RV was assembled in Indiana,

warranty repairs occurred in Indiana, and the Limited Warranty contained a forum-

selection clause that led to this lawsuit being filed in Indiana.

    However, the UCC's "appropriate relation" test is broader than Thor suggests.

"The analysis under the [UCC's] appropriate relation test is the same as that under

Indiana's intimate contacts test used for choice-of-law disputes in contract actions." *JM*

*McCormick Co. v. Int'l Truck & Engine Corp.*, No. 1:05-CV-146-RLY-TAB, 2007 WL

2904825, at *9 (S.D. Ind. Sept. 28, 2007) (citing *Dart Indus., Inc. v. Adell Plastics, Inc.,* 517 F.

Supp. 9, 10-11 (S.D. Ind. 1980)).[5] Thus, the parties' significant Arizona contacts are also

dispositive under the UCC's "appropriate relation" test.

    Additionally, the Court cannot disregard its previous application of Arizona law

to Thor's motion to dismiss. The law of the case doctrine emphasizes that once an issue

is litigated and decided, that should be the end of the matter. *Analytical Eng'g, Inc. v.*

*Baldwin Filters, Inc.,* 425 F.3d 443, 454 (7th Cir. 2005) (citations omitted); *see also Gertz v.*

*Robert Welch, Inc.,* 680 F.2d 527, 532 (7th Cir. 1982) ("The doctrine is a self-imposed

---

[5] Generally, Indiana's choice-of-law approach employs the "center of gravity" or "grouping of contacts" theory, which is consistent with the UCC's "appropriate relation" test and Indiana's "intimate contacts" test. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.,* 940 N.E.2d 810, 815 n.5 (Ind. 2010).

prudential limitation rather than a recognition of a limitation of the courts' power."). Here, Reger's implied warranty of merchantability claim against Thor was dismissed based upon Arizona law. [DE 16 at 3–5]. In addressing Reger's original breach of express warranty claim, the Court did not specify whether Arizona or Indiana law applied because factual deficiencies vis-à-vis the written warranty controlled the decision to dismiss the claim with leave to amend regardless of the choice of law. [*Id.* at 5–7]. Nevertheless, the Court found that Arizona law governed Reger's implied warranty claim against Thor—a conclusion consistent with the evidence of significant contacts in Arizona now before the Court at the summary judgment stage.

Furthermore, Thor's shift in argument implicates the doctrine of judicial estoppel. "Judicial estoppel is designed to prevent the perversion of the judicial process and should be applied where 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice. " *Smith v. Metro. Prop. & Cas. Ins. Co.*, No. 3:20-CV-053-JD-MGG, 2020 WL 5946599, at *3 (N.D. Ind. Oct. 7, 2020) (citing *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990)). "It should not be used where it would work an injustice, such as where the former position was the product of inadvertence or mistake[,] or where there is only an appearance of inconsistency between the two positions but both may be reconciled." *In re Cassidy*, 892 F.2d at 642 (internal citations omitted). Thor has not developed any argument to suggest that reliance on the *Bailey/Travelers* choice of law analysis it first advocated would work an injustice in this case. Thor simply cites new authority without any reflection on its previous argument. Regardless of Thor's concerning shift in position,

11

however, the *Bailey*/*Travelers* "intimate contacts" approach and the UCC "appropriate relation" test both lead to the application of Arizona law on Reger's breach of express warranty claim. As a result, judicial estoppel is not necessary to protect against inconsistent rulings by this Court.

Therefore, the totality of circumstances dictates application of Arizona law to Reger's MMWA breach of express warranty claim against Thor.

### b.   Discussion

The MMWA provides a cause of action for consumers "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract . . . ." 15 U.S.C. § 2310(d)(1). In his Complaint, Reger contends that Thor violated the MMWA by breaching its obligations under its Limited Warranty despite his compliance with all the terms of the Warranty. Reger alleges that Thor breached the Warranty "by not repairing the RV under the terms of the warranty, by refusing the RV under the terms of the warranty, and by actually covering up warranty issues by making sham repairs (as in the case of the roof cracks) . . . ." [DE 52 at 6, ¶ 39].

"Express warranties are treated like any other contract and interpreted according to general contract principles." *Chaurasia v. Gen. Motors Corp.*, 126 P.3d 165, 169 (Ariz. Ct. App. 2006). Thus, the language of the warranty establishes the obligations and rights of the parties. *See id.* When a written warranty is ambiguous, however, its terms are construed against the drafter. *De Shazer v. Nat'l RV Holdings, Inc.*, 391 F. Supp. 2d 791, 796 (D. Ariz. 2005).

Thor's Limited Warranty defines what defects in the RV it covers or excludes, its coverage periods, and the remedies available to address covered defects. [DE 80-4]. In a section entitled "What Is Not Covered," the Limited Warranty delineates parts, conditions, and damages excluded under the Warranty. [*Id.*]. The Warranty also outlines repair remedies for covered defects. [*Id.*]. Reger challenges Thor's compliance with the Limited Warranty in its handling of rust issues on the RV, defects allegedly arising from its extension of the frame rails on the Freightliner chassis, and other defects on the RV. Under the terms of the Warranty, Reger cannot prevail on his breach of express warranty claims unless he establishes that these defects were covered, that the defects were timely presented to Thor for repair, that Thor was given a reasonable opportunity to cure any nonconformity, and that both the primary and back-up remedies failed.

### i.      Rust

Since almost immediately after purchasing the RV, Reger has been complaining to Thor about rust and corrosion[6] on many parts of the RV including the door frame brackets, cargo bays, chassis, and near the brake and axle. [DE 80-1 at 81]. Reger even testified at his deposition that the rust would have been apparent at the time of purchase had he personally inspected the RV. [*Id.* at 106]. Reger's expert, Mr. Grismer, corroborated Reger's concerns in his October 2016 Appraisal Report where he identified premature rust and corrosion "from the entrance door area to the rear on both sides" as

---

[6] "Rust" and "corrosion" are not synonymous terms. Any distinction between them, however, is irrelevant to the instant motions. Therefore, the terms are used interchangeably throughout this Opinion.

one of two "highly concerning conditions" on Reger's RV. [DE 90-3 at 25]. Grismer

described the rust as "so severe that rust residue is literally dripping on the ground

under the vehicle on the right side." [*Id.*].

Regardless of the severity of the rust, the first relevant question in determining

whether Thor breached its Limited Warranty as to the rust on Reger's RV is whether it

was actually covered under the Warranty. Thor argues that rust is explicitly excluded

while Reger contends that the terms of the Limited Warranty are ambiguous and must

be construed against Thor. The plain language of the Warranty favors Thor. *See*

*Chaurasia*, 126 P.3d at 169.

The Limited Warranty makes clear what it covers in its first section, which reads:

> **THIS LIMITED WARRANTY COVERS**: The first retail owner ONLY
> and ONLY those portions of a NEW motorhome not excluded under the
> section "*What is Not Covered*", when sold by an authorized dealership;
> and, ONLY defects in workmanship performed and/or materials used to
> assemble those portions of your motorhome not excluded under the
> section "*What is Not Covered*". "Defect" means the failure of the
> workmanship performed and/or materials used to conform to the design
> and manufacturing specification and tolerances of Thor Motor Coach
> ("TMC"). The Limited Warranty is not transferable.

[DE 80-4]. Neither Reger nor Thor challenges Reger's standing as the first retail owner

of the RV or the RV's "new" status for purposes of the Limited Warranty. Thus, there is

no dispute that the Limited Warranty applies to the RV to the extent of its terms. Under

those terms, the Warranty covers only defects in workmanship and materials in the

assembly of the portions of the RV not excluded in the Warranty.

In a section entitled **WHAT IS NOT COVERED**, the Warranty explicitly

excludes "the automotive chassis and power train, including by way of example the

engine, drive-train, steering, ride and handling, braking, wheel balance, muffler, tire wear or failure, tubes, batteries and gauges . . . ." ("the Chassis/Power Train Exclusion") [*Id.*]. Also excluded from coverage is "flaking, peeling and chips or other defects or damage in or to the exterior or finish caused by rocks or other road hazards, the environment, including chemical off-gassing, airborne pollutants, salt, tree sap and hail causing any damage including but not limited to rust and corrosion." ("the Exterior/Finish Exclusion") [*Id.*]. Reger argues that these terms are ambiguous as to whether rust on the RV's frame[7] is excluded and as to what constitutes the "exterior or finish."

In support, Reger relies on this Court's previous conclusions in its order addressing Thor's motion to dismiss. Specifically, the Court found that even if the rust on the chassis were excluded by the Chassis/Power Train Exclusion, the same exclusion "would not appear to exclude coverage for rust found on the frame." [DE 16 at 7]. Additionally, the Court stated that "[t]he chassis and frame are not part of the 'finish' of the RV, and might not be considered part of its 'exterior,' either, perhaps depending on where the rust was found." [*Id.* at 6]. Then Reger cites his own deposition testimony as evidence that the bays and door frame brackets are not excluded under the Exterior/Finish Exclusion because they are inside. [DE 90 at 15 (citing DE 90-1 at 78–82)]. Yet Reger cites nothing more thereby asking the Court to rely solely on his non-

---

[7] Whether Reger uses the word "frame" here to reference rust on the chassis's frame rails or rust on the walls and roof of the box/house portion atop the chassis does not matter given the plain language of the Warranty, as discussed below.

expert opinion as to what parts of an RV are included in the "chassis and power train" or are part of the "exterior or finish."

Thor also relies on Reger's deposition testimony as evidence that there is rust on the underneath exterior chassis components of the RV but then cites the Affidavit of Mark Stanley, Thor's Technical Manager, for further support as to the location of the rust. Stanley has more than 30 years experience in the RV industry and reports that he has a "complete understanding" of Thor's Tuscany model. [DE 80-3 at ¶¶ 2–3]. Having inspected Reger's RV and reviewed its warranty history, Stanley states:

> There are some rust spots on the underneath exterior chassis components of the RV which is consistent with undercarriage rust by weather and road salt. There are also rust spots on other portions of the chassis and on the metal finish of the frame of the compartment bays and doors of the RV. All of the rust is either on the chassis or on the metal finishes of the RV.

[*Id.* at ¶ 11].

Based on this limited record, the Court must determine the ambiguousness of the Chassis/Power Train Exclusion and the Exterior/Finish Exclusion. *See Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015) ("[The court is] not required to scour through . . . deposition transcript[s] in order to verify an assortment of facts, each of which could be located anywhere within the . . . depositions cited."); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[The court] will not root through the . . . the record here to make his case for him."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs , hunting for truffles buried in [the record].").

16

Under the law of the case doctrine, this Court's previous Opinion and Order cannot be disregarded. If the scope of the Warranty's exclusions was definitively litigated and decided, that decision will be applied. *See Analytical Eng'g, Inc.,* 425 F.3d at 454; *see also Gertz,* 680 F.2d at 532. However, this Court did not fully litigate the scope of the Warranty's exclusions as Reger suggests. The Court found it premature to reach any conclusion as to what defects are or are not covered by the Warranty. [DE 16 at 6]. With that said, the Court noted the obvious—that the chassis and frame are not part of the "finish"—while conceding that the chassis and frame may be part of the "exterior" depending on the location of the rust. [*Id.*]. The Court also contemplated application of the Chassis/Power Train Exclusion to rust on the frame without any factual analysis. In other words, the Court did not reach any decision as to scope of the Warranty's exclusions deferring instead to evidence that could be adduced later in litigation. As a result, the evidence designated by the parties and only the evidence so designated—Reger's deposition testimony and Stanley's Affidavit—controls the decision about the scope of exclusions.

Reger's deposition testimony, as cited, simply reflects his observations of the location of the rust without any showing as to whether the rust locations fall under the Chassis/Power Train or Exterior/Finish Exclusions. Reger also challenges the Stanley Affidavit presented by Thor contending that it "merely asserts legal conclusions or contradicts other evidence about the warranty and Reger's complaints." [DE 90 at 16]. Indeed, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show

17

that the affiant or declarant is competent to testify on the matters stated." *Fed. R. Civ. P. 56(c)(4)*. As such, legal arguments and legal conclusions in summary judgment affidavits are not recitations of fact and can be disregarded. *Paniaguas v. Aldon Companies, Inc.*, No. 2:04-CV-468-PRC, 2006 WL 2568210, at *5 (N.D. Ind. Sept. 5, 2006) (and cases cited therein). Yet Reger develops no evidence or argument to support disregarding Stanley's Affidavit. Accordingly, Reger has waived any such argument. *See United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017).

Moreover, the Stanley Affidavit includes admissible facts that provide more insight into the scope of the Warranty exclusions than anything else on the record. Stanley's knowledge and experience as an RV professional familiar with the Thor Tuscany model, Thor's Warranty, and Reger's RV make his assertions about the location of the rust on the chassis or the metal finishes credible. Thus, Thor's Warranty is not ambiguous as to its exclusion of rust under the Chassis/Power Train Exclusion and the Exterior/Finish Exclusion.

Reger's attempts to insert ambiguity into the Warranty language are also unavailing. Noting that the Warranty covers "the steel or aluminum frame structure" ("the Structural Warranty"), Reger suggests that an ambiguity exists as to coverage of rust on the frame rails, which could be covered under the Structural Warranty or excluded under the Chassis/Power Train Exclusuion. Yet the Warranty states plainly that the Structural Warranty is limited to "the sidewalls (excluding slide outs), roof, and rear and front walls." [DE 80-4]. This language does not include the foundational frame rails and Reger presents no evidence to establish that it does.

18

Therefore, at this put-up-or-shut-up moment, Reger has not designated evidence to overcome the Stanley Affidavit, which clarifies that all the rust on the Reger RV is on the chassis or finishes, both of which are excluded from coverage under the express terms of the Warranty. *See Hammel*, 407 F.3d at 859. As a result, Reger cannot prevail on any claim for breach of express warranty as to the rust. Accordingly, as to the express warranty count, summary judgment for Thor is warranted as a matter of law on Reger's rust claims.[8]

### ii.   Frame Rail Extension Issues

In the spring of 2016, Reger was inspecting his RV trying to determine the extent of the rust and noticed for the first time that the frame rails supporting the RV had been extended. [DE 90-1 at 88]. Reger informed Thor of the extension and a range of defects on the RV related to the extension. Reger argues that Thor breached its Warranty by not resolving the defects presumably caused by the frame rail extension.

To start, Thor does not dispute that modified the frame rails, which were incorporated into the Freightliner chassis, when assembling Reger's RV. Reger has also provided the following persuasive evidence that many of the RV's defects were at least related to the frame rail extension. Touting his years of experience working with motor

---

[8] Thor also argues that the Warranty's Disclaimer of Consequential and Incidental Damages provides an independent basis for summary judgment on the rust claims. Reger counters that Arizona law nullifies the Warranty's disclaimer of consequential and incidental damages. *See Muller v. Winnebago Indus., Inc.*, 318 F. Supp. 2d 844, 849 (D. Ariz. 2004) ("Even where the manufacturer's limited warranty excludes consequential damages, such damages may be available if the exclusive or limited remedy fails of its essential purpose." (citing A.R.S. § 47-2719)). Under Arizona law, a chassis manufacturer could be responsible for both defects to the chassis and consequential issues caused by the chassis. *DeShazer*, 391 F. Supp. 2d 796. However, finding summary judgment appropriate here for Thor based upon the Chassis/Power Train and the Exterior/Finish Exclusions, the Court need not consider any potential conflict between the Warranty's Consequential and Incidental Damages Disclaimer and Arizona law.

homes and aircraft[9], Reger testified that the frame rail extension was done incorrectly leading to flexing in the unit, which caused problems with the RV. [*Id.* at 89]. Mr. Grismer testified that roof cracks, cracked floor tiles, problems with the entry steps, shaking slide-outs, vibrating mirrors, and shifting windshield frame were caused by stress cracking or flexing in the unit attributable to the frame rail extension. [DE 90-2 at 39–41, 44–47, 55, 94–95]. Mr. Grismer further opined that Thor cut the frame rails in the wrong place and improperly welded them to the extension rails. [*Id.* at 52–53; 83–84; *see also* DE 90-3 at 26]. Additionally, Michael Winterrowd, service manager at Terry's RV in Frankfort, Illinois, where Reger took his RV in May 2017 for further assessment of its problems, testified that many of the RV's defects could be attributed to flexing in the unit that could be caused by a frame rail extension done incorrectly. [DE 90-3 at 59, 61].

This evidence linking Thor's frame rail extension to the RV's defects is interesting but irrelevant to whether the frame rails themselves are covered under the Warranty. Thor argues that the frame rails, as part of the chassis, are excluded from coverage based on the plain language of the Chassis/Power Train Exclusion. Similarly, Thor contends that the Chassis/Power Train Exclusion and the Consequential Damages Disclaimer exclude any defects resulting from the frame rail extension from coverage.

Reger, on the other hand, still posits that the Chassis/Power Train Exclusion is ambiguous as to the exclusion of the frame rails from coverage. Reger also continues to argue that the Structural Warranty is ambiguous as to the frame rails. However, Reger's

---

[9] Reger testified that he never worked with or on a motor home or aircraft with a chassis extension before. [DE 90-1 at 89–91].

ambiguity arguments fail here just as they did in relation to the rust. Moreover, Thor would reasonably exclude from its Warranty any parts of the RV manufactured by another entity, like Freightliner, and covered under a separate warranty, if any. With no evidence designated to suggest that the frame rails were **not** manufactured by Freightliner as part of the chassis, Thor's Chassis/Power Train Exclusion can only be read one way—to exclude the frame rails from coverage. As a result, Reger presents nothing to lead a rational trier of fact to find that the frame rails are covered under Thor's Warranty. *See Matsushita Elec. Indus. Co., 475 U.S. at 587*.

Any defects arising as a consequence of the frame rail extension are also excluded under Warranty. After all, repairing defects whose root cause is the frame rails would require repair of the frame rails, which are expressly excluded from coverage. With no evidence that the frame rails are covered under the Warranty, there can be no breach of Thor's express Warranty. Therefore, summary judgment in favor of Thor is warranted on Reger's warranty claims arising from the frame rail extension.

### iii.   Remaining Express Warranty Defects

In its instant Motion, Thor presents a three-page chart acknowledging approximately 14 additional defects[10] in Reger's RV that were identified by Mr. Grismer at his deposition as part of Reger's breach of express warranty claim. Thor's chart discusses each defect as well as coverage under the Warranty, presentation for repairs

---

[10] Thor identifies the remaining defects as: roof cracks, pit-marked interior floor tiles, tile cracks in the master bedroom and bathroom, incorrectly placed, shower stall, batteries that do not charge completely, defective inverter or alternator/charging system, generator door, entry step alignment, gaps between side moldings and the body, slide-out issues, paint peel and other marks, bent and twisted storage door, and abnormal noise from leveling jacks. [DE 80 at 15–17].

during the Warranty period, and exhaustion of applicable remedies. In response, however, Reger does not discuss any of the defects individually. He just states—without citation to any facts or legal authority—that Thor's argument for summary judgment "on these items fails because Thor . . . relies on Indiana law . . . ." [DE 90 at 24]. Reger does not even distinguish how the analysis of these claims would change if Arizona law were applied.

Reger also concludes that questions of fact exist on the 14 claims without identifying those questions with specificity. Reger merely cites a 39-page document labeled "Unit History Information." The document lists Reger's warranty claims and details repairs to the RV but Reger does not explain the significance of the document to any of the 14 defects in the chart. As a result, Reger has not satisfied his affirmative obligation to establish issues of fact on these claims by setting forth evidence in support. *Hammel*, 407 F.3d at 859. As noted above, the Court need not root around in the record attempting to identify meaningful evidence or arguments for a party, and declines to do so here. *See Dunkel*, 927 F.2d at 956. Therefore, Thor is entitled to summary judgment as to the 14 additional defects listed in Thor's chart as well as the rust and frame rail claims for breach of express warranty raised under the MMWA.

### 2.      IDCSA Claims (Count III)

#### a.      Factual Background

Faced with a long list of problems with his RV, Reger sought repairs from Thor, ARV, and other RV dealers, including Terry's RV. Three of the RV's problems were particularly concerning—roof cracks, frame rust, and weakened structural integrity

following Thor's frame rail extension. In his Complaint, Reger alleges that Thor concealed these three problems before and after the sale of the RV, did not properly address the roof cracks and rust issues, and did not disclose that Freightliner's frame rail warranty was voided by virtue of Thor's frame rail extension. [DE 52 at 7]. Reger alleges that Thor's conduct in these three instances amounted to unfair and deceptive acts or practices that violated the Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-3. Through its instant Motion, Thor argues that it is entitled to summary judgment as a matter of law because the Commerce Clause of the United States Constitution should prohibit application of the IDCSA to this case. Alternatively, Thor contends that Reger's IDCSA claims fail because he did not provide effective notice as required by the statute and cannot demonstrate a specific violation of the statute.

### b.      The IDCSA

"The IDCSA is a remedial statute designed to provide remedies to consumers for practices that the[Indiana] General Assembly deemed deceptive in consumer transactions." *Hoopes v. Gulf Stream Coach, Inc.,* No. 1:10-CV-365, 2014 WL 4829623, at *11 (N.D. Ind. Sept. 29, 2014) (internal quotations omitted) (citing *Banks v. Jamison,* 12 N.E.3d 968, 974, n. 6 (Ind. Ct. App.2014)). The IDCSA shall be liberally construed and applied to promote its purposes and policies. Ind. Code § 24-5-0.5-1(a); *see also Kesling v. Hubler Nissan, Inc.,* 997 N.E.2d 327, 332 (Ind. 2013). The IDCSA's purposes and policies are to: "(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices; (2) protect consumers from suppliers who

23

commit deceptive and unconscionable sales acts; and (3) encourage the development of fair consumer sales practices." Ind. Code § 24-5-0.5-1(b).

Under the Act, a consumer is authorized to sue a supplier that engages in "deceptive acts." *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 646 (Ind. Ct. App.2004). The Act expressly prohibits suppliers from "commit[ting] an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction," including "both implicit and explicit misrepresentations," that "occur[] before, during, or after the transaction." Ind. Code 24-5-0.5-3(a). A "supplier" is defined as a "seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions [and] includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer." Ind. Code Ann. § 24-5-0.5-2. Deceptive acts can be made orally, in writing, or by electronic communication and include 40 categories of conduct enumerated in the statute. Ind. Code § 24-5-0.5-3(b).

### i.     Constitutional Challenge

Thor challenges the constitutionality of applying the IDCSA to Reger's purchase of the RV. The Commerce Clause of the United States Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const., Art. I, § 8, cl. 3. The Commerce Clause is violated by States when they regulate or control commerce occurring wholly outside their own borders, whether or not the commerce has effects within the regulating State. *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989); *Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 658 (7th Cir. 1995). The Commerce Clause also precludes

state laws that have the "practical effect" of controlling conduct beyond their own boundaries. *Edgar*, 457 U.S. at 643.

Thor contends that the IDCSA constitutes extraterritorial legislation that improperly regulates transactions occurring outside Indiana between non-Indiana parties in violation of the Commerce Clause. Thor argues that the IDCSA's silence on its geographical reach has the practical effect of regulating transactions between non-Indiana parties wholly outside the borders of Indiana. Commerce Clause jurisprudence establishes three potential categories of state laws that improperly "*discriminate* against interstate commerce, either expressly or in practical effect." *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017). Thor advocates for an inference that the IDCSA has a discriminatory effect on interstate commerce but develops no argument as to how the IDCSA discriminates against interstate commerce, how the statute affects other States compared to its effect on Indiana, or if there are neutral justifications for those effects. *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130 (7th Cir. 1995)). Thor simply concludes, without support, that the IDCSA has the practical effect of unconstitutionally regulating out-of-state transactions and should not be applied to Reger's RV purchase.

Thor's undeveloped argument is both unpersuasive and waived. *See Parkhurst*, 865 F.3d at 524. Moreover, this Court has allowed IDCSA claims involving sales to non-Indiana consumers in other states to persist. *See, e.g.*, *Graham v. REV Recreation Group, Inc.*, CAUSE NO.: 1:17-CV-351-TLS, 2018 WL 1334991, at *3 (Mar. 14, 2018) (denying motion to dismiss IDCSA claim related to RV manufactured and assembled in Indiana

25

and purchased by Ohio residents from a North Carolina dealer); *cf. Castagna v. Newmar Corp.*, CAUSE NO. 3:15-CV-249-TLS, 2016 WL 3413770, at *6–*7 (June 22, 2016) (denying motion to dismiss IDCSA claim where Florida resident purchased RV, manufactured by Indiana corporation, in Florida); *Hoopes*, 2014 WL 4829623, at *11–*12 (applying IDCSA to claim by Ohio residents who purchased RV, manufactured by Indiana corporation, in Ohio). The Reger sale also implicates Indiana's interests because Thor assembled the RV in Indiana, repaired the RV at its Indiana facility, and incorporated a venue clause in its Warranty requiring actions related to the RV be brought in Indiana. Reger's IDCSA claim even alleges deceptive conduct in Indiana. Therefore, applying the IDCSA to the Reger RV sale serves to promote Indiana's stated interest in protecting consumers from suppliers, like Thor, that engage in deceptive conduct.

### ii.    Merits of IDCSA Claim

In his Complaint, Reger alleges that Thor violated the IDCSA with three separate deceptive acts. First, Reger alleges that Thor concealed cracks on the RV's roof in June 2016 at Thor's Indiana repair facility. [DE 52 at 7]. Second, Reger alleges that Thor concealed frame rust on the RV in October 2015 at the ARV sales lot ("Rust Claim"). [*Id.*]. Third, Reger alleges that at the ARV sales lot on the purchase date of August 21, 2015, Thor concealed that Freightliner's "frame rails warranty" was voided ("Warranty Claim"). [*Id.*].[11]

---

[11] In his response brief, Reger suggests that Thor also violated the IDCSA based on evidence that the RV was not new at the time of purchase. [DE 90 at 27; *see* Ind. Code 24-5-0.5-3(b)(3)]. However, Reger's Complaint alleges only the three deceptive acts outlined above. Therefore, the Court will not consider any potential IDCSA violation based on the newness of the RV at the time of purchase.

A plaintiff may not bring an action under the IDCSA unless the alleged deceptive act is incurable as defined by the statute or the plaintiff gives the supplier written notice of the uncured deceptive act within the timeframe set forth in the Act. *See* Ind. Code § 24-5-0.5-5(a)(2). Written notice is not required for incurable deceptive acts. *See id*. § 24-5-0.5-5(a)(1). Here, the parties disagree as to whether the three separate deceptive acts alleged by Reger are incurable acts or uncured acts, which in turn determines whether written notice to Thor was required. Thor concedes that questions of fact exist as to whether the Roof Cracks Claim is incurable. However, Thor contends that the Rust and Warranty Claims are uncured such that written notice is required under the Act. Thor then challenges the timeliness of Reger's written notice of all three deceptive acts. Thor further argues that to the extent Reger has met the notice requirements of the IDCSA, his claims fail as a matter of law.

### A)    Incurability

A deceptive act is incurable if it is "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(8). "Intent on the part of the violator is required under the Act for 'incurable' deceptive acts but is not required for most other 'deceptive acts.'" *Smith v. Nexus RVs, LLC*, No. 317CV00815DRLMGG, 2020 WL 3403178, at *8 (N.D. Ind. June 19, 2020) (internal quotations omitted) (citing *McKinney v. State*, 693 N.E.2d 65, 67 (Ind. 1998)). "An uncured act is one where no offer to cure is made to the consumer within thirty days or when an offer to cure is made and accepted but not completed within a reasonable time." *Id.* (citing Ind. Code § 24-5-0.5-2(7)). A consumer's failure "to give proper notice

27

to the supplier of an uncured deceptive act precludes the application of the [IDCSA] altogether." *Lehman v. Shroyer*, 721 N.E.2d 365, 368 (Ind. Ct. App. 1999). With Thor's concession as to the Roof Cracks Claim, only the incurability of the Rust and Warranty[12] Claims demand attention.

In support of the incurability of his Rust Claim, Reger relies primarily upon his own deposition testimony and Affidavit but also cites Mr. Grismer's deposition testimony and Appraisal Report, a series of his emails with ARV and Thor representatives between September 2015 and August 2016, and the Unit History Information. Reger outlines the sequence of events between his initial discovery of rust shortly after taking possession of the RV in August 2015, discovering rust on the frame rails and chassis in the spring of 2016, assorted discussions with Thor representatives about the rust and attempts to repair it through June 2016, and the report from a Thor representative in June 2016 that the RV chassis sat outside at Thor's facility before the RV was assembled. Incorporated into Reger's timeline are his conclusions that Thor concealed rust, refused to repair all the rust, and failed to disclose what it knew about the cause of the rust. He then contends this evidence creates a genuine dispute of material fact as to a scheme by Thor to avoid repairs under its Warranty.

Missing, however, from Reger's recitation of facts and conclusions is evidence of any intent on Thor's part to defraud or mislead as necessary to establish incurability. *See McKinney v. State*, 693 N.E.2d at 67. At most, Reger suggests an inference of potential

---

[12] Thor rejects Reger's contention that the Freightliner warranty was voided noting that only the portion of Frieghtliner's chassis warranty covering frame rails was voided by the frame rail extension. [DE 95 at 15 (citing DE 90-4 at 58)].

malintent. And while inferences are to be drawn in non-movants' favor when deciding motions for summary judgment, those inferences must be justifiable. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

Here, Reger's evidence of intent boils down to three unsupported inferences: (1) that Thor's September 2015 representation that the rust was caused by road salt that was not washed off constituted a misrepresentation; (2) that "either Thor or ARV tried to conceal the rust rather than repair it by simply painting over it" [DE 90 at 29]; and (3) that Thor knew about frame rust because it knew, but did not disclose, that the frame sat outside at Thor's facility before assembly. These inferences, based solely on Reger's deposition testimony and Affidavit, do not connect enough dots between the facts he reports and an intent to defraud or mislead by Thor. Rather, Reger's deposition testimony and Affidavit reflect his mere speculation about Thor's role in the problems with this RV. *Cf. Paniaguas*, 2006 WL 2568210, at *5 (identifying statements in affidavits that should be disregarded including "mere speculation or conjecture").

Moreover, Reger's inferences of intent do not follow from the facts he references. Misrepresentation of the rust's cause, painting over the rust, and failure to disclose that the frame sat outside before assembly may or may not be deceptive acts, but do not necessarily establish the intent to defraud or mislead required to deem the Rust Claim an incurable deceptive act. By failing to designate evidence to bridge the gap between the facts and any malintent by Thor, Reger has merely speculated as to Thor's intent. At summary judgment, speculation is not enough. *Cf. Hammel*, 407 F.3d at 859. As such,

Reger has not established a genuine dispute of material fact as to the Rust Claim's incurability.

Conversely, Thor's inaction in advising Reger that the chassis warranty was voided by the rail modification deserves further analysis. Reger contends that a question of fact exists as to Thor's intent to defraud or mislead him about the voiding of Freightliner's chassis warranty. In this instance, Reger's inferences derive from more than rank speculation. Based on the testimony of Freightliner's Rule 30(b)(6) witness, Dennis Rostenbach, and Mr. Grismer, a reasonable trier of fact could find that (1) frame rail modifications were common in the RV industry; (2) such modifications commonly voided frame rail coverage in any applicable warranty; and (3) Thor knew the effect of its frame rail extension on the applicable warranty. These justifiable inferences combined with the undisputed fact that Reger was not told about the frame rail extension or the voiding of the frame rail portion of the chassis warranty create a genuine dispute of material fact as to whether Thor intentionally withheld this warranty information from Reger and thus intended to defraud or mislead him.

### B) Notice

Uncured deceptive acts can be the subject of IDCSA actions if

the consumer bringing the action shall have given notice in writing to the supplier within the sooner of (i) six (6) months after the initial discovery of the deceptive act, (ii) one (1) year following such consumer transaction, or (iii) any time limitation, not less than thirty (30) days, of any period of warranty applicable to the transaction, which notice shall state fully the nature of the alleged deceptive act and the actual damage suffered therefrom . . . .

Ind. Code § 24-5-0.5-5(a). IDCSA actions "may not be brought more than two (2) years after the occurrence of the deceptive act." Ind. Code § 24-5-0.5-5(b). Neither Thor nor Reger argue that any of Reger's three alleged deceptive acts fail to qualify as "uncured" under the statute. The record, however, is unclear on multiple points relevant to pre-suit notice under the IDCSA.

First, the actual statutory deadline for Reger's IDCSA notice to Thor is difficult to calculate from the record. Neither Reger nor Thor identified an exact date when Reger initially discovered each alleged deceptive act. Some assumptions about can be made from Reger's deposition testimony and the emails he cites but are unnecessary. Thor seeks to hold Reger to a pre-suit notice deadline of August 20, 2016—one year after Reger purchased the RV—and Reger does not contest this date leading the Court to infer that the statute's six-month post-discovery, one-year post-transaction, or warranty period deadlines would not change the deadline.[13] *See* Ind. Code § 24-5-0.5-5(a)(2)(ii).

Second, the dates of any potential written notices by Reger are also unclear. According to his Complaint, Reger "gave Thor notice in writing on October 29, 2017." [DE 52 at 6, ¶ 41]. Thor hangs its hat on this date as being well past the statutory deadline of August 20, 2016, and develops no other argument. Yet, neither party designates any evidence of written notice on October 29, 2017.[14] Instead, Reger

---

[13] Thor further confuses the notice deadline in its reply brief. *Compare* DE 80 at 20 ("As to Reger, this would mean he must have provided notice to Thor at least one year after the transaction (i.e. August of 2016)."), *with* DE 95 at 12 ("Under the IDCSA, pre-suit notice was required to be given on or before August 20, 2017."). With no basis for the 2017 date in the statute, the Court assumes it was stated in error.
[14] In responding to ARV's motion for summary judgment, not Thor's, Reger designates a letter dated October 29, 2016, from Plaintiff's former counsel to ARV and Thor. [DE 88-3 at 393–94]. The Court need

designates his emails to Thor about tile cracks and rust in September and October 2015 and roof cracks on July 30, 2016, as evidence that he sufficiently notified Thor of the Roof Cracks and Rust Claims. As to the Warranty Claim, Reger cites his own testimony that he did not learn of the frame rail extension, that may have caused the tile and roof cracks, until April or May of 2016, but designates no communications with Thor about the frame rail extension or the voided warranty.

This confusing record lacks any evidence from Reger to establish that he provided timely and adequate written pre-suit notice of the Warranty Claim to Thor. Reger has, however, designated emails discussing the October 2015 Rust Claim and the June 2016 Roof Cracks Claim. These emails were sent before the notice deadline of August 20, 2016. If they constitute "notice in writing" as required by the Act, they are presumably timely. The unresolved question, however, is whether the emails would satisfy the statutory requirement that the notice "state fully the nature of the alleged deceptive act[s] and the actual damage suffered therefrom." *See* Ind. Code § 24-5-0.5-5(a)(2). Thor develops no argument assessing the substantive character of Reger's designated emails. And Reger simply concludes that "[t]hese emails are sufficient to notify Thor, or at least raise a jury question as to whether they sufficiently notified Thor," without any mention of how the emails might address his "actual damage."

Alternatively, Reger posits that if he did not timely notify Thor of the deceptive acts as the IDCSA requires, a genuine dispute of material fact exists as to whether Thor

---

not consider this letter here because the parties failed to designate it for this purpose. *See Corley,* 388 F.3d at 1001; *Dunkel,* 927 F.2d at 956.

fraudulently concealed the defects such that the pre-suit notification deadline was tolled. In support, Reger cites *Cwiakala v. Econ. Autos, Ltd.*, 587 F. Supp. 1462, 1466 (N.D. Ind. 1984), which discusses Indiana law on the tolling of statutes of limitations due to fraudulent concealment.[15] What Reger fails to mention is that the fraudulent concealment doctrine discussed in *Cwiakala* is only triggered in the event of active and intentional concealment, not just passive silence. *Id.* By failing to designate any evidence to distinguish Thor's conduct as active and intentional concealment rather than passive silence, Reger waives his tolling argument. *See Parkhurst*, 865 F.3d at 524.

In sum, genuine disputes of fact exist as to the incurability of the Roof Cracks and Warranty Claims and as to whether Reger provided Thor with timely and adequate notice of the Roof Cracks and Rust Claims under the IDSCSA. These disputes, however, do not overcome Thor's motion for summary judgment on Reger's three IDCSA claims if they fail on their merits.

### C)    Roof Cracks Claim

As pled, Reger's Roof Cracks Claim alleges that Thor violated the IDCSA at its repair facility in June of 2016, "by slapping on a gel coat to hide the cracks" in the RV's roof. [DE 52 at 7, ¶ 42]. Thor argues that Reger's Roof Cracks Claim fails as a matter of law because (1) it does not constitute a deceptive act under the IDCSA; (2) there is no evidence of Reger's reliance on the alleged deceptive act; and (3) there is no evidence that Thor improperly repaired the roof causing Reger damages.

---

[15] Reger only provided a citation to the case as whole without any pinpoint citations to assist the Court.

Reger first discovered cracks in his RV's roof in the Spring of 2016. When he brought the cracks to Thor's attention in June 2016, he testifies that he was told the cracks were just in the gelcoat, not the fiberglass. He also reports being told that if the cracks were in the fiberglass, the entire roof would need to be replaced. Thor then performed a patch repair, which entailed filling the cracks with gel coat, rebuilding the gel coat layer on the roof, and painting the gel coat to match. [DE 80-3 at 4, ¶ 12]. Reger did not believe that the cracks were just in the gel coat and consequently sanded off the gelcoat to see if the fiberglass was cracked. [DE 90-1 at 96]. Finding cracks in the fiberglass, Reger returned the RV to Thor in September 2016 for further attention.

Thor argues that the alleged conduct related to the roof cracks does not constitute one of the 40 specifically enumerated "deceptive acts" under the IDCSA making summary judgment appropriate.[16] Without being specific, Reger contends that Thor's concealment of the roof cracks in June of 2016 constitutes a deceptive act under at least one of the following statutory categories:

> (1) That such subject of a consumer transaction has . . . performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

> (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

> (3) That such subject of a consumer transaction is new or unused, if it is not and if the supplier knows or should reasonably know that it is not.

---

[16] Thor relies upon *Lawson v. Hale*, 902 N.E.2d 267 (Ind. Ct. App. 2009), which rejected a claim for failure to disclose a crack in a tractor's engine block as inconsistent with the IDCSA. After *Lawson* was decided, the IDCSA was amended to include deceptive acts, omissions, or practices, including both implicit and explicit misrepresentations occurring before, during, or after the transaction. Ind. Code § 24-5-0.5-3(a). Therefore, *Lawson* is inapposite in relation to any of Reger's failure to disclose allegations.

. . . .

(5) That replacement or repair constituting the subject of a consumer transaction is needed, if it is not and if the supplier knows or should reasonably know that it is not.

. . . .

(8) That such consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false.

Subsection (3) cannot apply to the Roof Cracks Claim because it does not allege a misrepresentation about newness of the RV. Subsection (5) cannot apply because it relates to representations that repairs are needed when they are not—the exact opposite of Reger's allegation that Thor underestimated the repairs needed to resolve the roof cracks. Subsection (8) does not apply because the Roof Cracks Claim has nothing to do with representations about the availability of warranties. That leaves only subsections (1) and (2) as possible categories of deceptive acts for the Roof Cracks Claim.

Thor raises no argument as to subsection (2) misrepresentations regarding the quality of the subject of a consumer transaction. Therefore, any such argument is waived such that the Roof Cracks Claim could qualify as a subsection (2) deceptive act. *See Parkhurst,* 865 F.3d at 524.

Thor does challenge, however, the applicability of subsection (1) to the Roof Cracks Claim. Thor contends that subsection (1) regarding misrepresentations as to the performance, characteristics, or benefits of the subject of a consumer transaction cannot apply because the alleged communications did not occur at or near the time of Reger's

purchase of the RV. However, the plain language of the IDCSA does not limit its application to defective acts surrounding the purchase of a consumer product. The IDCSA defines "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service or an intangible" with exceptions not relevant here. Ind. Code § 24-5-0.5-2(a)(1). A "subject of a consumer transaction" is defined as "personal property, real property, services, or intangibles offered or furnished in a consumer transaction." *Id.* § 24-5-0.5-2(a)(4). Here, Reger alleges that Thor implicitly misrepresented the scope of the roof crack problem and the benefits of the gelcoat repair by "slapping on" gelcoat rather than repairing the cracks in the fiberglass. While the misrepresentation did not occur in the context of the RV purchase, it did occur in the context of another consumer transaction, namely the Thor's gelcoat repair in June 2016. Thus, at the very least, a genuine dispute of material fact exists as to whether the Roof Cracks Claim constitutes subsection (1) deceptive act.

To prevail on his Roof Cracks Claim, Reger must also establish that reliance on Thor's alleged deceptive act caused him to suffer actual damages. Ind. Code § 24-5-0.5-4(a). Thor's argument here rises and falls on whether Reger contradicted himself in his deposition testimony. According to Reger, his testimony shows that he relied on Thor's statement in June 2016 that the cracks did not extend to the fiberglass when he permitted Thor to repair the cracks with the gelcoat method. [DE 90-1 at 95]. Yet, as Thor notes, Reger also testified that he did not believe Thor's statement about the extent of the cracks and sanded off the repair to assess the situation himself. [*Id.* at 96]. Whether Reger establishes reliance based on this testimony requires weighing

36

potentially contradictory testimony and assessing Reger's credibility—two classic charges to juries. Thus, a genuine dispute of material fact exists as to reliance.

Reger must finally show that he suffered actual damages from Thor's gelcoat repair to prevail on his Roof Cracks Claim. Here again, the parties present conflicting evidence that must be weighed by a jury. Thor argues that Reger suffered no damages because the gelcoat repair was the appropriate repair method for the small cracks in Reger's roof. In support, Thor relies upon Mark Stanley's Affidavit stating the roof cracks were "minor cosmetic cracks" for which a gelcoat repair was proper. Mr. Grismer also opined that gelcoat repair was the proper solution to minor roof cracks.

However, Mr. Grismer's testimony brings into question whether the roof cracks were minor or substantial. Mr. Grismer testified that the roof cracks "were caused by defective fiberglass molding and stress cracking." [DE 90-2 at 38]. He also testified that repairing substantial roof cracks would require replacing the roof. [*Id.* at 41]. While nothing besides Reger's own testimony has been designated to show that the cracks might be substantial, Mr. Grismer's testimony about the cause of the cracks raises questions as to whether the cracks were as minor as Mr. Stanley opines.

With the genuine disputes of fact described above, summary judgment is not appropriate as to Reger's Roof Cracks Claim under the IDCSA.

### D)     Rust Claim

Thor argues that Reger's Rust Claim fails as a matter of law because (1) it does not constitute a deceptive act under the IDCSA; (2) Reger has not identified a misrepresentation by Thor regarding the rust; and (3) Reger has not provided evidence

of any detrimental reliance on any misrepresentation. Yet, the facts relevant to the Rust Claim are hard to discern given inconsistencies in the Complaint itself and Reger's and Thor's differing interpretations of the facts underlying the Claim.

In his Complaint, Reger describes the Rust Claim in the following two rhetorical paragraphs:

> 41.    As described above, Thor sold Plaintiff an RV that had a rusted out frame and chassis, which was structurally unsound because of its extension. . . .
>
> 42.    Thor concealed these problems with the RV both pre- and post-sale. . . .Thor . . . attempted to cover up the rust problem on the interior of the RV by painting over it and also falsely blaming the corrosion on road salt. Specifically:
>
> a.    **Who**: Defendant Thor, by its employees . . .;
> b.    **What**: Concealment of . . . frame rust . . .;
> c.    **When**: . . . October of 2015 . . .;
> d.    **Where**: . . . Arizona RV sales lot;
> e.    **How**: . . . by painting over rust and by verbally falsely attributing the corrosion to road salt, when in fact, the chassis, frame rails, and coach frame were rusted out on Thor's lot, pre-assembly, because, on information and belief, Thor left them to rust there and consequently used these defective materials in assembling the RV . . . .

[DE 52 at 6–7]. References to a "rusted out frame and chassis," "the rust problem on the interior of the RV," and "frame rust"—without further explanation—make it unclear what rust was painted over and falsely attributed to road salt in violation of the IDCSA as Reger alleges. The timing of the alleged violation is also unclear as the Complaint references the rusted nature of the RV *when Thor sold Reger the RV*, alleges concealment both *pre-sale and post-sale*, and identifies *October 2015* as the month when the unspecified rust was painted over.

Thor's instant Motion pins the Rust Claim to concealment of rust at the time of sale. In support, Thor emphasizes the undisputed fact that Thor had no contact with Reger before he purchased the RV along with Reger's deposition testimony that the rust would have been noticeable and apparent to him had he inspected the RV before the purchase. Reger, however, cites facts in his response brief that could pertain to pre- or post-sale concealment.

Reger first cites Mr. Grismer's opinion, reflected in his deposition testimony and Appraisal Report, that the RV began to rust prematurely and perhaps before the purchase suggesting pre-sale concealment. Reger then cites his own deposition testimony as evidence that he (1) discovered the rust on the interior of the RV in September 2015, (2) discussed it with a Thor representative who blamed the rust on road salt, which Reger found unlikely at best, and indicated that rust was not covered under Thor's Warranty, and (3) rejected Thor's offer to repair the rust by wire-brushing and treating the visible areas of corrosion because it would not solve the entire rust problem. [DE 90-1 at 81–83]. This evidence is consistent with concealment post-sale.

Lastly, Reger cites pages in his deposition transcript where he testified that either Thor or ARV clearly painted over internal rust based on his observations of "paint over the top of the rust." [Id. at 106]. The pages cited include no indication of when the rust might have been painted over but end with Reger's affirmation that the rust would have been apparent to him had he inspected the unit at the time of purchase. [Id. at 107]. Given this hodge-podge of a record, no rational trier of fact could determine what exactly is being alleged, let alone whether it qualifies as a deceptive act under the

IDCSA; whether Reger detrimentally relied upon an enumerated deceptive act; or what damages Reger may have actually suffered. *See Matsushita Elec. Indus. Co.*, 475 U.S at 587. While there may be unresolved questions as to how the assorted rust issues were handled by Thor, Reger has not met his burden to present evidence of the existence of each element of his Rust Claim under the IDCSA. *See Celotex*, 477 U.S. at 322–23. Accordingly, Thor is entitled to summary judgment on the Rust Claim.

### E)        Warranty Claim

As pled, Reger's Warranty Claim alleges that Thor violated the IDCSA on August 21, 2015—the date he purchased the RV—"by giving the warranty to [him] without disclosing that the frame rail warranty was voided by virtue of Thor's modifications of the frame rails." [DE 52 at 7, ¶ 42]. Thor unsuccessfully argues that the Warranty Claim fails as a matter of law.

Thor again emphasizes the undisputed fact that it had no contact with Reger before the purchase of the RV and contends that Reger presents no evidence of an oral or written misrepresentation concealing that the Freightliner warranty was voided. However, Thor's lack of contact with Reger about the Freightliner warranty is evidence itself that Thor failed to disclose the effect of the frame rail extension on the Freightliner warranty. And as discussed above, the IDCSA in its current form allows for claims based on implicit misrepresentations or omissions. Thus, Reger has minimally established a genuine dispute of material fact as to whether Thor's omission constitutes a deceptive act, presumably under subsection (8) quoted above.

Thor has also failed to establish as a matter of law that Reger did not rely on its failure to disclose the voiding of the frame rail warranty. Reger's testimony that at the time of his purchase, he had no understanding that he was getting any warranty from Freightliner may be pertinent to determining whether Reger relied on Thor's omission. That fact alone, however, does not definitely resolve the reliance issue. This lawsuit itself is evidence that Reger may not have purchased the RV in August 2015 had he known at the time that any problems arising from the frame rail modification would not be covered under any warranty.

A genuine dispute of material fact also exists as to whether Reger suffered any actual damages as the result of Thor's failure to disclose the frame rail extension and its effect on the Freightliner warranty at the time of the purchase. Thor focuses attention on the lack of evidence from Reger that Freightliner denied any warranty claims because of the allegedly void warranty. Thor fails to describe with particularity the import of this fact and discusses no other evidence of damages. Reger, on the other hand, has not only presented his own deposition testimony about the issues arising from the frame rail extension, he has also designated Mr. Grismer testimony in which he opines that the frame rail extension is the likely the underlying cause for many of the RV's problems. A reasonable trier of fact could conclude from this evidence along that these problems all constitute actual damages arising from Thor's failure to disclose the voided Freightliner at the time of purchase. Thus, summary judgment is not warranted on Reger's Warranty Claim.

### 3.     Common Law Fraud Claim (Count VIII)

Reger's last claim against Thor is for common law fraud. Reger alleges that Thor

engaged in common law misrepresentation and fraudulent concealment by jointly

publishing, with Freightliner, promotional materials about the Tuscany RV model

Reger purchased that included inaccurate statements concealing the voiding of

Freightliner's warranty. Attached to Reger's Complaint is "Exhibit D" referenced in his

fraud claim. Exhibt D is a two-page document entitled "Tuscany Tag" identifying

features and specifications of the 2015 Model Year XCR Series Motorhome Chassis. [DE

52 at 23–24]. The logos of Thor Motor Coach, Freightliner Custom Chassis, and non-

party Cummins are depicted toward the top of the Tuscany Tag. A "Customer Support"

box is located at the bottom of the second page of the Tuscany Tag and includes a

smaller version of the Freightliner Custom Chassis logo. In the "Customer Support"

box, assorted warranties are described in a list as follows:

> 24/7 Factory Direct Customer Support at 1-800 FTL HELP (1-800-385-
> 4357) *Available for New and Used Freightliner Chassis.
> Basic Chassis 3 years 50,000 mi / 80,500 km with towing and roadside
> assistance
> Battery 1 year 100,000 mi / 161,000 km
> Brightwork 6 months Unlimited
> Corrosion 6 months Unlimited
> Cross members 5 years 100,000 mi / 161,000 km
> Drivetrain 3 years 50,000 mi / 80,500 km
> Frame Rails 5 years 100,000 mi / 161,000 km

[*Id.* at 25].

To establish a claim for actionable fraud under Arizona law[17],

> a plaintiff must show that the defendant made a false, material
> representation that he knew was false or was ignorant of its truth, with the
> intention that the hearer of the representation act on it in a manner
> reasonably contemplated, that the hearer was ignorant of the
> representation's falsity, rightfully relied on the truth of the representation,
> and sustained consequent and proximate damage.

*Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 944 (Ariz. Ct. App. 2000). Thor argues that it is

entitled to judgment as a matter of law because Reger testified that he did not see the

Tuscany Tag before purchasing the RV. As a result, Thor contends that Reger cannot

establish that he qualifies as a "hearer of the representation act" or that he relied upon

the truth of the representations on the Tuscany Tag before purchasing the RV.

Reger does not submit any evidence to suggest that he saw the Tuscany Tag

before purchasing the RV. Rather, he implies that whether he saw the Tag before his

purchase is irrelevant because Thor had a duty to disclose the frame rail modification

and resulting voided warranty. Reger's argument is not well developed but seems to

rely upon the principle that "[h]alf-truths can be the stuff of fraud claims." *Lerner v.

DMB Realty, LLC*, 322 P.3d 909, 921 (Ariz. Ct. App. 2014) (Thompson, J., dissenting)

(citing Prosser, Torts, 5th Ed. § 106 ("half of the truth may obviously amount to a lie, if it

is understood to be the whole.")). Yet Reger does not connect this authority to the fact

that he did not see the Tuscany Tag. Similarly, Reger's reference to "unfulfilled

promises" as grounds for actionable fraud, as stated in *Enyart v. Transamerica Ins. Co.,*

---

[17] Under Indiana choice-of-law rules discussed above, Arizona rather than Indiana has the most
significant relationship to Reger's purchase of the RV. *See Travelers Indem. Co.,* 715 N.E.2d at 931; *see also
Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 940 N.E.2d at 815 n.5; *JM McCormick Co.,* 2007 WL 2904825, at *9.

985 P.2d 556, 563 (Ariz. Ct. App. 1998), does not account for situations like this where the allegedly defrauded consumer did not see or hear the promise.

As a result, Reger has not created a genuine dispute of material fact as to his common law fraud claim and Thor is entitled to summary judgment on that claim.

### 4.    Conclusion

As discussed above, Thor is entitled to summary judgment on all but Reger's IDCSA Roof Cracks and Warranty Claims.

### B.    ARV's Motion for Summary Judgment [DE 81]

Before turning to the merits of ARV's instant Motion, the Court must consider ARV's request in its reply brief to strike and not consider five facts asserted by Reger in his Statement of Genuine Disputes. [DE 96 at 1–2]. ARV contends that they contradict earlier sworn testimony and should be disregarded. To the extent necessary, the Court will address ARV's request to strike these five, allegedly contradictory, facts in its analysis of the relevant claims below.

### 1.    Breach of Implied Warranty of Merchantability (Count IV)

Congress enacted the MMWA to "prevent warranty deception." *Parrot v. DaimlerChrysler Corp.*, 130 P.3d 530, 532 (Ariz. 2006) (citations omitted). Under the MMWA, the terms and conditions of warranties must be conspicuously disclosed "in simple and readily understood language." *Id.* (quoting 15 U.S.C. § 2302(a)). "To bring a cause of action under the MMWA, a person must be a consumer of a consumer product and have a written warranty, implied warranty, or service contract, as those terms are defined by the MMWA." *Id.* The parties agree that under the MMWA, Reger constitutes

44

a "consumer," ARV is a "supplier" and "warrantor," and the RV is a "consumer product." *See* 15 U.S.C. § 2301(1), (3)–(5). However, the parties dispute whether ARV disclaimed any implied warranty arising under Arizona law.[18] *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) ("Claims under the Magnuson–Moss Warranty Act 'stand or fall with . . . express and implied warranty claims under state law.'") (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)).

"[I]mplied warranties may be disclaimed in writing [but] only if the disclaimer is conspicuous." *Nomo Agroindustrial Sa De CV v. Enza Zaden N. Am., Inc.*, 492 F. Supp. 2d 1175, 1180 (D. Ariz. 2007) (citing Ariz. Rev. Stat. Ann. 47-2316(B)). Under the Arizona UCC, "'[c]onspicuous,' with reference to a term, means so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it." Ariz. Rev. Stat. Ann. § 47-1201(B)(10). Yet, the MMWA prohibits suppliers from disclaiming or modifying implied warranties if "such supplier makes any written warranty to the consumer with respect to such consumer product, or at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product." 15 U.S.C. § 2308(a).

Here, ARV argues that it conspicuously disclaimed all warranties, express and implied, related to the RV in the Purchase Agreement Reger signed on August 21, 2015. [DE 82-2]. In opposition, Reger contends that the disclaimer in the Purchase Agreement is not effective because (1) it does not satisfy the requirements of conspicuousness set

---

[18] Neither ARV nor Reger dispute that Arizona law applies based either upon a choice of law provision in the relevant Purchase Agreement [DE 82-2 at 2 ("This agreement shall be governed by the laws of the State of Arizona.")] or the Indiana choice of law analysis discussed i above.

forth in Ariz. Rev. Stat. Ann. § 47-1201(B)(10); (2) it is not a valid contract; and (3) he

purchased a service contract through ARV. Reger further argues that ARV breached the

implied warranty of merchantability by selling him a defective RV that was not "new."

[*See also* Third Amended Complaint, DE 52 at 8 ¶¶ 48–49].

> ### a.    Conspicuousness

Whether a term is conspicuous is a question of law. Ariz. Rev. Stat. Ann. § 47-

1201(B)(10). The statute cites examples of "conspicuous terms," which include but are

not limited to

> (a) A heading in capitals equal to or greater in size than the surrounding
> text, or in contrasting type, font or color to the surrounding text of the
> same or lesser size; and
>
> (b) Language in the body of a record or display in larger type than the
> surrounding text, or in contrasting type, font or color to the surrounding
> text of the same size, or set off from surrounding text of the same size by
> symbols or other marks that call attention to the language.

*Id.*; *see also* [DE 16 at 10 (indicating that "the examples offered in the statutory definition

of 'conspicuous' are not exclusive")]. In arguing for dismissal of Reger's implied

warranty claim, ARV relied only upon a warranty disclaimer provision in the Retail

Installment Contract and Security Agreement ("RICSA") executed by Reger on August

20, 2015—one day before the Purchase Agreement was executed. The Court found that

the RICSA disclaimer was not distinguishable in appearance from any other part of the

contract. As such, the Court concluded that the disclaimer was not sufficiently

conspicuous thereby precluding any valid disclaimer of the implied warranty of

merchantability. [*See Id.* at 9–11].

Now, ARV presents a second disclaimer—this time in the Purchase Agreement—in defense of Reger's implied warranty claim. As shown below, the second paragraph in the left column is entitled "Limitations/Exclusions of Product Warranties" and reads:



"(A) For "new" Vehicles (1) If the Vehicle is purchased for personal use, Seller makes no implied warranty of merchantability or of fitness for any particular purpose unless Seller also gives Purchaser a written warranty, on its own behalf, with respect to the Vehicle, or, at the time of sale or within 90 days thereafter, Seller enters into a service contract on its own behalf with Purchase which applies to the Vehicle. In any event, any implied warranties arising from the sale of the Vehicle shall be limited to the duration of Sellers written warranty or service contract . . . ."

[DE 82-2 at 1]. Different from all other paragraphs on the front page of the Purchase Agreement, this Warranty Limitation Paragraph is in boldface type and appears to be in a slightly larger font size. As a result, the disclaimer of ARV's implied warranty of merchantability in the Warranty Limitation Paragraph satisfies the conspicuousness requirements set forth in Ariz. Rev. Stat. Ann. § 47-1201(B)(10).

Unlike the warranty disclaimer paragraph in the RICSA, the Warranty Limitation Paragraph in the Purchase Agreement is distinguishable from the appearance of the other parts of the Purchase Agreement. The Warranty Limitation Paragraph's heading is not in capitals but is in contrasting boldface type that is larger — if only slightly — than the text in surrounding paragraphs. The body of the Paragraph can also be distinguished by its boldface type and font size when compared to the Agreement's surrounding text. The Paragraph may not be flashy, but "a reasonable person[19] against which it is to operate ought to have noticed it." *See id.* Therefore, ARV has conspicuously disclaimed any implied warranty.

### b. Validity of Purchase Agreement

Reger, however, challenges the effectiveness of any conspicuous disclaimer arguing that the Purchase Agreement is not a valid contract for lack of a merger clause and additional consideration for the warranty disclaimer. When purchasing the RV from ARV, Reger signed two separate agreements: the RICSA on August 20, 2015, and the Purchase Agreement on August 21, 2015. According to Reger's deposition testimony, he purchased the RV on August 20th when he signed the RICSA, or closed with the bank on his financing. [DE 88-1 at 46]. While an ARV representative walked through the RV with Reger on the 20th providing details on its features and operations, the RV was not completely ready for pickup that day. [*Id.*]. So Reger returned to ARV on August 21st to take possession of the RV at which point an ARV representative told

---

[19] Reger may constitute more than a "reasonable person" in this context based on his considerable experience in business with contracts. However, the standard here only requires a reasonable person to be able to notice the disclaimer.

him some paperwork, including the Purchase Agreement, had been forgotten the day

before. Therefore, Reger signed the Purchase Agreement and the RICSA on different

dates. [*Id.* at 46–47].

The principles of merger and consideration are central to contract law. "Merger

with respect to the law of contracts refers to the extinguishment of one contract by its

absorption into another contract." *Clark v. Compania Ganadera de Cananea, S.A.*, 385 P.2d

691, 695 (Ariz. 1963). As a result, "[t]he rule of merger does not apply to those

provisions of the antecedent contract which the parties do not intend to be

incorporated" into the new agreement. *Title Ins. Co. of Minn. v. Costain Ariz., Inc.*, 791

P.2d 1086, 1091 (Ariz. Ct. App. 1990). Here, Reger argues that the Purchase Agreement

does not include a "merger" clause linking it back to the RICSA. However, the Purchase

Agreement makes clear that it only becomes binding when accepted by the Dealer "and

if, at a time of sale 1) appropriate financing disclosures are made, and 2) a Retail

Installment Sales Contract and Purchase Money Security Agreement ("Contract") is

executed." [DE 82-2 at 1 ("Offer to Buy" Paragraph)]. Thus, the Purchase Agreement is

necessarily linked to the RICSA by its own terms.

Consideration "is a benefit to the promisor or a loss or detriment to the

promisee." *K-Line Builders, Inc. v. First Federal Sav. & Loan Ass'n*, 677 P.2d 1317, 1320

(Ariz. Ct. App. 1983). A substituted contract,[20] such as a later contract containing a term

---

[20] A substituted contract is defined in Restatement (Second) of Contracts § 279 as follows:
> . . . (1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.
> (2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee the right to enforce the original duty."

inconsistent with an earlier contract between the same parties, "is not effective unless it is supported by consideration or some substitute for consideration." *Id.* at 1321. Yet the Purchase Agreement is not a substituted contract and the Arizona UCC provides that "[a]n agreement modifying a contract within this chapter [governing the sale of goods] needs no consideration to be binding." Ariz. Rev. Stat. Ann. § 47-2209. Moreover, the Arizona UCC allows parties to a sale to explain or supplement the terms of a written agreement "by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." Ariz. Rev. Stat. Ann. § 47-2202. Therefore, no new promises or consideration was required to validate the Purchase Agreement.

Accordingly, Reger's merger or consideration concerns do not invalidate the Purchase Agreement, which governs the parties' relationship as to the sale of the RV along with the RICSA.

### c.   MMWA Restrictions on Disclaimers of Warranties

As alleged alternatively in his Complaint, Reger argues that any disclaimer of implied warranties in the Purchase Agreement is ineffective because ARV entered into a service contract with him. [DE 52 at 8, ¶ 46]. As noted above, the MMWA restricts suppliers, like ARV, from disclaiming any implied warranty if it extends a written warranty to the consumer or enters a service contract with the consumer at the time of sale or within 90 days thereafter. *See* 15 U.S.C. § 2308(a). "A disclaimer . . . made in

---

*K-Line Builders, Inc.*, 677 P.2d at 1321.

violation of [Section 2308] shall be ineffective for purposes of this chapter and State law." *Id.* § 2308(c). The Purchase Agreement's Warranty Limitation Paragraph explicitly accounts for this disclaimer exception when it says:

> Seller makes no implied warranty . . . unless Seller also gives Purchaser a written warranty, on its own behalf . . . or, at the time of sale or within 90 days thereafter, Seller enters into a service contract on its own behalf with Purchaser . . . .

[*See* DE 82-2 at 1]. Reger contends that he entered a service contract with ARV at the time of sale thereby establishing an implied warranty of merchantability.

There is no dispute that Reger purchased a service contract ("the ESP") for the RV at the time of sale. Reger attached the two-page "Motor Home Service Agreement Declaration Page," with a "Good Sam Extended Service Plan" header, to his Complaint. [DE 52 at 21–22]. On that Service Agreement, signed by Reger on August 20, 2015, ARV is identified as the Dealer by the name "Camping World RV Sales – Mesa" with "Bank of the West" named as the lienholder. In a section entitled "OTHER PROVISIONS," the Service Agreement also provides:

> The ADMINISTRATOR of this SERVICE AGREEMENT is United Service Protection Corp. [("USPC")], Post Office Box 20899, St. Petersburg, FL 33742. The telephone number is 1-866-869-8097. The OBLIGOR under this SERVICE AGREEMENT, which is referred to as "WE," "US" and "OUR" throughout the Service Agreement, is United Service Protection Corp., the address and phone number of which are provided above.
> . . . .
> Purchase of this SERVICE AGREEMENT is not required in order to purchase or obtain financing for the UNIT. This SERVICE AGREEMENT is not valid unless this DECLARATION PAGE is completed correctly. This DECLARATION PAGE shall be the basis upon which the SERVICE AGREEMENT is issued. YOUR signature indicates that YOU have read the information set forth herein and agreed that it is true and correct and that YOU accept the terms

and provisions of this SERVICE AGREEMENT and agreed to be bound by the terms thereof.

[*Id.* at 21].

Other documents also undisputedly reference the service contract. The Purchase Agreement, which also identifies Camping World RV Sales as the "Dealer" with ARV's address at the top of the document, includes a charge for "Service Contract" in the amount of $8,200. [DE 82-2 at 1]. The RICSA, identifying Camping World of Mesa AZ as the Seller using the same ARV address referenced in the Purchase Agreement, includes a section entitled "Additional Protections" in which the box for "Service Contract" is checked with notations of a term of "84 months", a price of "$8,200.00", and coverage "as per Vehicle Service Contract." [DE 82-3 at 3].[21] Neither of these agreements reference Good Sam or USPC.

Based on these documents[22], Reger argues that ARV is a party to the ESP. At the very least, Reger contends that the documents conflict such that they create a genuine dispute of material fact as to who offered the ESP to Reger. Reger buoys this argument with his deposition testimony and Affidavit. At his deposition, Reger testified that he believed at the time of purchase that the service contract "was through Camping World [or ARV] and . . . they would do whatever [was] needed to be done to service the coach for whatever warranty issue arose." [DE 88-1 at 56]. In his Affidavit, he states that ARV's general manager Shawn Williams told him that ARV "offered an optional

---

[21] In the same section, the RICSA reflects Reger's purchase of a paint protection contract for $1,225, which is not relevant here. [DE 82-3 at 3].

[22] There is some irony in Reger's reliance on the Purchase Agreement here considering his previous argument that the Purchase Agreement did not constitute a valid contract.

Extended Service Plan warranty (the 'Service Contract') [and] offered [him] the Service Contract in the [RICSA]." [DE 88-3 at 374–75, ¶¶ 16, 18]. He also cites to seven documents he received from ARV, which include both the Good Sam and Camping World logos, to suggest confusion as to the relationship between the two brands.[23] Lastly, Reger cites the ESP's directions for filing a claim, which starts with: "In the event of a MECHANICAL BREAKDOWN, take the UNIT to the dealer that sold YOU this AGREEMENT, if at all possible."[24] [DE 52 at 22]. Reger understood this provision to have been evidenced by his taking the RV to ARV for repairs in October 2015.

This web of evidence may confuse Reger as to whether ARV was a party to the ESP, or service contract, but it is only a red herring here. Nothing in the Service Agreement, the Purchase Agreement, or the RICSA documents suggests that ARV was a party to the Service Agreement itself. In fact, the plain language of the Service Agreement only binds USPC, not ARV, to its terms. Reger's reliance on *Lemons v. Showcase Motors, Inc.*, 88 P.3d 1149, 1153–53 (Ariz. Ct. App. 2004) is therefore misplaced. In *Lemons*, the court found that a genuine dispute of material fact existed as to whether a dealer entered into a service contract with a consumer. *Id.* at 1153. The court reasoned that the language of the contract, which stated "[t]hat the Dealer shall be the sole

---

[23] Reger cites to the following documents produced by ARV in discovery: DE 88-3 at 31 (checklist for Reger's RV); *Id.* at 238 (email signature block for ARV's Service Advisor); *Id.* at 248 (financing quote); *Id.* at 253 (financing pledge); *Id.* at 278 (sales checklist); *Id.* at 299 (Service Agreement Declaration Page); and *Id.* at 317 (trade-in worksheet). Reger also refers to one other document for the same purpose, but it is a blank insurance quote form with only the Good Sam Insurance Agency logo at the top and no reference to Camping World or ARV. *Id.* at 314.

[24] Reger indicates that he attached his ESP to his response brief as Exhibit H. [DE 88 at 10]. Exhibit H [DE 88-4 at 1–3] is the Purchase Agreement, not the ESP attached to his Complaint.

contracting party with customers under all Service Contracts and [the administrator] shall have no liability to customers," expressly connected the dealer to the service contract. *Id.* Here, however, the Service Agreement Reger signed includes no such language. Rather, the Service Agreement obligates only USPC, not ARV, under the service contract. Reger's understanding of the implications from ARV's facilitating the sale of the ESP or its repairing the RV has no impact given the clear and unambiguous language of the Service Agreement.

Citing Section 2308(a) of the MMWA again, Reger lastly argues that the pre-delivery inspection ("PDI") he purchased for $1,295 from ARV constitutes a written warranty thus creating an implied warranty of merchantability.[25] The MMWA defines "written warranty" as

> **(A)** any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

> **(B)** any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,

> which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

---

[25] Noteworthy is Reger's contention here that the PDI was completed by ARV and constituted a written warranty on behalf of ARV while he alleged in his Complaint that ARV violated the Arizona Consumer Fraud Act by charging Reger $1,295 for a PDI that it never completed. [*See* DE 52 at 10, ¶ 63].

15 U.S.C. § 2301(6). As evidence of a written warranty, Reger directs the Court's attention to the first page of what appears to be a six-page document produced in discovery that is a checklist related to Reger's RV. [DE 88-3 at 31]. The document lacks any title or explanation on the page designated. It is just a list of RV features checked off. The third page of the document is a signature page with some explanation to allow an inference that the checklist reflects a review of the RV during the walk-through before possession. [*Id.* at 33]. Notably, there are only blanks for signatures of the customer and no signature is on the form. The third page also states:

> The buyer hereby accepts the above described vehicle in its present "AS IS" condition (unless otherwise noted on a "Due Bill") and waives all warranties including the dealer's implied warranty of merchantability and the dealers implied warranty of fitness. EXCEPT FOR WARRANTY OF THE MANUFACTURER, IF ANY, the entire risk as to the quality and performance of the vehicle is with the buyer, and if the vehicle proves defective after purchase, the buyer and not the dealer, distributor or retailer assumes the entire cost of all necessary servicing or repairs.

[*Id.*].

Yet Reger contends this is a PDI that constitutes a written warranty. In support, Reger relies on a New York state case where the court found that a PDI of an RV before purchase "constituted a 'written warranty' under the [MMWA], since it represented that the motor home had been inspected and tested and was found to 'perform, function, operate and/or serve exactly as intended'." *Marine Midland Bank, N.A. v. Carroll*, 98 A.D.2d 516, 519 (N.Y. App. Div. 1984). Whether New York caselaw supports Reger's claim is irrelevant because the PDI form in *Marine Midland Bank* is distinguishable from the alleged PDI form Reger designates here. In *Marine Midland*

*Bank*, the PDI form was completed and signed by the dealer's service manager. *Id.* at 518. Reger's form was signed by no one and had no signature line for an ARV representative. This alone brings into question whether it constitutes a written warranty. Regardless of the signature issue, Reger's form does not explain what the checkmarks for each of the RV's features means. The check marks could simply mean that the RV was equipped with those features. Without more, the form makes no "affirmation of fact" relating to "the nature of the material or workmanship" and whether the "material or workmanship is defect free" to qualify as a written warranty under the MMWA. *See* 15 U.S.C. § 2301(6)(A).

Thus, ARV successfully disclaimed any implied warranty of merchantability as to Reger's RV with its conspicuous disclaimer in the valid Purchase Agreement because ARV was not a party to either a written warranty or a service contract as to the RV. Accordingly, ARV is entitled to judgment as a matter of law on Reger's implied warranty claim in Count IV.

### 2.      Revocation of Acceptance (Count V)

In Count V of his Complaint, Reger raises claims for "Revocation of Acceptance, Cancellation of Contract" under two provisions of the Arizona UCC. In its revocation of acceptance provision, the Arizona UCC provides:

> **A.** The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:
>
> 1. On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

2. Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

**B.** Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

**C.** A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Ariz. Rev. Stat. Ann. § 47-2608(A)–(C). Cancellation of the contract is then a remedy available to a buyer who justifiably revokes acceptance. Ariz. Rev. Stat. Ann. § 47-2711(A)[26]; *see also IMA N. Am., Inc. v. Maryln Nutraceuticals, Inc.*, No. CV-06-344-PHX-LOA, 2008 WL 4737888, at *1 (D. Ariz. Oct. 28, 2008) ("a buyer must comply with the statutory requirements of [A.R.S. § 47-2608] to cancel a contract for the sale of goods.").

> **a.** **Effect of Disclaimer of Warranties on Revocation Claim**

In seeking summary judgment on Count V, ARV relies initially on the assumption that the absence of any warranty is fatal to any claim for revocation. As such, ARV suggests that a successful disclaimer of warranties would preclude Reger's revocation of acceptance claim. Reger does not challenge this premise in his summary judgment briefing. In fact, he implicitly concedes the point as he sets out the legal standard for addressing the merits of the revocation claim when he states "[w]hether a ***warrantor*** was given a reasonable opportunity to cure is a question of fact." [DE 88 at 12 ( citing *DeShazer*, 391 F. Supp. 2d at 798) (emphasis added)].

---

[26] In his Complaint, Reger miscites Section "46-2711, Arizona Revised Statutes" rather than Ariz. Rev. Stat. Ann. § 47-2711 as the UCC provision on cancellation of contract. [DE 52 at 9 (Count V)].

Unfortunately, ARV's assumption does not fully account for the full range of facts relevant to the analysis here. Moreover, the parties have not directed the Court to definitive authority on the issue. Reger does not tackle the issue directly at all. And ARV relies upon one case applying the Michigan UCC to show that "[t]he absence of any warranty is fatal to claims for revocation." [DE 96 at 9 (citing *Sautner v. Fleetwood Enters.*, No. 05-73252, 2007 WL 1343806, at *4–*5 (E.D. Mich. May 8, 2007)). *Sautner* is helpful to an extent because the relevant Michigan revocation statute is identical to Arizona's. *Compare* M.C.L. § 440.2608, *with* Ariz. Rev. Stat. Ann. § 47-2608(A)–(C). However, ARV understates the court's conclusion in *Sautner*. In *Sautner*, the court found that the seller's disclaimers of all warranties barred the buyer from revoking acceptance largely because the relevant purchase agreement sold the vehicle "AS IS" despite assurances that the vehicle would be new. *Sautner*, 2007 WL 1343806, at *6. The court thus concluded that the buyer "took the risk as to the quality of the motor home" such that her revocation of acceptance claim failed. *Id.*

This Court's own review of Arizona authority on this issue unearthed very little but found that Arizona might approach UCC revocation claims in the absence of any warranties similarly to Michigan. For instance, the Arizona Supreme Court in *Seekings v. Jimmy GMC of Tucson, Inc.* refused to "find that the disclaimer [of warranties] precludes the remedy of revocation of acceptance." 638 P.2d 210, 216 (1981) (en banc); *see also* 638 P.2d at 217 (concluding as to an RV sold as new rather than "AS IS" that "[t]he disclaimer precludes a breach of warranty claim, but it does not avoid revocation if the

vehicle does not conform to the representation that it can be made new within a reasonable time.").

On the flip side, however, a Florida court stated more directly that "an effective disclaimer of *all* warranties, both expressed and implied" precludes any finding of "nonconformity to the contract based on the condition of the machine." *McCormick Machinery, Inc. v. Julian E. Johnson & Sons, Inc.*, 523 So.2d 651, 656 (Fla. Dist. Ct. App. 1988) (emphasis in original). The *McCormick* court went on to endorse the finding of Ohio courts that "where there is a valid disclaimer of all warranties, including the warranty of merchantability, the remedy of revocation of acceptance for nonconformity is not available to a dissatisfied customer." *Id.* (collecting cases and distinguishing the Ohio cases from *Seekings*' decision, "finding that the seller's oral representations were part of the contract and as such were not negated by a written disclaimer.") (citations omitted).

Neither party has argued sufficiently on the question of whether Arizona law precludes claims for the remedy of revocation of acceptance based solely on a disclaimer of warranties as ARV asks this Court to embrace. Moreover, neither party has accounted for the undisputed fact, potentially outcome determinative as to Reger's revocation claim, that ARV sold the RV to Reger as "new" rather than "AS IS."[27] Thus, the Court cannot find that ARV is entitled to summary judgment as a matter of law

---

[27] To argue that ARV sold the RV to Reger "AS IS" rather than as "new" would be detrimental to other claims and defenses presented by the parties in this case.

based solely upon the complete lack of applicable warranties from ARV and turns to the merits of Reger's revocation claim.

**b.       Merits of Revocation Claim**

Under Ariz. Rev. Stat. Ann § 47-2608(A)(1) and (B), revocation is allowed if a nonconformity is not "seasonally cured," if revocation occurs "within a reasonable time" after a buyer discovers or should have discovered the nonconformity, and if there is not a "substantial change in the condition of the goods." ARV argues that Reger cannot succeed on his revocation of acceptance claim because there is no evidence of (1) reasonable opportunity to cure, (2) timely revocation, or (3) a lack of substantial change in the condition of the RV given Reger's use of it.

As to reasonable opportunity to cure, Reger designates his own Affidavit, email exchanges, and service records to show that he not only informed ARV of the defects he discovered shortly after purchasing the RV but allowed ARV to take possession of the RV for repairs three times in the three months after his purchase. ARV did not rebut this evidence. Therefore, a genuine dispute of material fact exists as to whether Reger gave ARV a reasonable opportunity to cure the defects he reported to them.

ARV may still be entitled to judgment as a matter of law if Reger did not notify ARV of his revocation in a reasonable time or if his notification came after any substantial change in the condition of the RV. In a letter sent to both Thor and ARV via regular mail and email on October 29, 2016, Reger explicitly confirmed his revocation of acceptance of the RV. [DE 88-3 at 393]. By that time, Reger had sought repairs for the RV from ARV, Thor, and other parties on at least seven occasions, requiring approximately

60

75 days of service, as evidenced by the service records he designates here. Between the time of purchase and October 2016, Reger also used the RV as his residence putting about 15,000 miles on it based on his own testimony and Affidavit.[28]

"When a delay in notification is due to a series of complaints and attempted repairs, the delay is not unreasonable." *Seekings*, 638 P.2d at 218. However, "[r]easonableness of the time for revocation is a question of fact unique to the circumstances of each case." *Golembieski v. O'Rielly R.V. Ctr., Inc.*, 708 P.2d 1325, 1328 (Ariz. Ct. App. 1985). The service records and email exchanges with ARV and Thor about repairs between August 2015 and November 2016 are enough to create a question of fact as to whether his revocation letter, sent fourteen months after purchase, was reasonably delayed based on his efforts seeking repairs.

Yet, Reger has not designated evidence to create a genuine dispute of fact as to whether the condition of the RV substantially changed between the time of sale and October 2016 when Reger sent ARV his revocation letter. ARV asks the Court to infer from the mileage difference between the time of sale and the time of alleged revocation that there was a substantial change to the condition of the RV. While that is a plausible inference, ARV designates no evidence to support such a conclusion. A substantial change in the condition of an RV should be relatively easy to document by comparing purchase records with service records and by deposition testimony from RV service professionals or even an expert opinion. ARV designates none of this basic evidence.

---

[28] According to the Purchase Agreement, the RV had 2,053 miles on it at the time of purchase. [DE 88-3 at 2]. At the time of Dr. Grismer's first inspection on October 16, 2016, the mileage on the RV was 17,055 miles. [DE 88-2 at 22, 24].

With that said, Reger presents precious little evidence to rebut ARV's mileage evidence despite his burden as the party opposing ARV's summary judgment motion to marshal and present evidence on which a reasonable jury could rely to find for him on this claim. *See Goodman*, 621 F.3d at 654. Reger's attempt to shift the burden to ARV is unsupported at the very least, if not completely misplaced. Moreover, Reger relies upon an inference from *Seekings*, 638 P.2d at 218[29] that continued use of a motor home does not waive revocation of acceptance without developing any rationale to justify such an inference. In *Seekings*, the opinion does not indicate clearly whether the RV owner continued to use the motor home at issue. Moreover, the *Seekings* court allowed the plaintiff's revocation of acceptance claim to proceed despite valid disclaimers of warranties without any discussion of the effect of continued use of the RV on the revocation claim. *Id.* at 217.

As for evidence specific to the condition of his RV, Reger only references Dr. Grismer's testimony that the condition of the RV did not change between his first inspection in October 2016[30] and his second inspection in August 2017. This is irrelevant to determining whether the condition of the RV changed substantially between the time of sale in August 2015 and the time of the revocation letter at the end of October 2016. With nothing more, Reger's has failed to put up evidence that there was no substantial change in the condition in the RV given the 15,000 miles of use established by Reger's

---

[29] Reger actually cited *Seekings* at "130 Ariz. at 218." [DE 88 at 14]. Given the mismatched pinpoint citation, the Court assumes Reger was referencing 638 P.2d at 218.

[30] Reger states that Dr. Grismer's first inspection was in August 2016. [DE 88 at 14]. However, this is inconsistent with Dr. Grismer's own testimony that he conducted his first inspection on October 16, 2016. [DE 88-2 at 22].

own expert. *See Hammel*, 407 F.3d at 859. As such, ARV is entitled to judgment as a matter of law on Reger's revocation of acceptance claim.

### 3.      ACFA Claims (Count VI)

In his Complaint, Reger alleges that ARV violated the Arizona Consumer Fraud Act ("ACFA") by:

- selling him an RV that was not "new" [DE 52 at 10, ¶ 62–63];

- charging him an inspection fee but doing no inspection [*Id.*, ¶ 63–64];

- failing to disclose that the frame rails had been extended by the RV manufacturer [*Id.*, ¶ 65];

- failing to disclose that the RV had been in a pre-sale accident [*Id.* at 10–11, ¶ 65]; and

- falsely representing that the RV came with a chassis warranty but concealing that the frame rail portion of that warranty was voided by Thor's modification of the frame rails [*Id.* at 11, ¶ 66].

Under the ACFA,

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Ariz. Rev. Stat. Ann. § 44-1522. ARV argues that summary judgment in its favor is warranted because each of Reger's ACFA claims are legally or factually deficient.

### a.      New or Used RV

Reger alleges that the RV was not "new" when he purchased it because ARV used it as a demonstrator at the Phoenix Motor Speedway. [DE 52 at 10, ¶ 63]. Reger

learned of the RV's use at the Speedway from ARV's Williams in a phone call sometime after November 26, 2015—about three months after Reger purchased the RV and after he had submitted the RV for repairs at ARV at least three times. As evidence here, Reger designates the deposition testimony of his expert Dr. Grismer, ARV's Interrogatory Answers, and his own Affidavit.

Dr. Grismer opined that the RV was not new at the time of sale based on his review of the repair records reflecting problems with the RV both before and after the sale, his own inspection of the RV, and Reger's statement to him that the RV had been used as a demonstrator at an RV show. [DE 82-2 at 31–32]. ARV confirmed that the RV arrived from Thor with 1,898 miles on it and that it displayed the RV on its lot and at the Phoenix International Speedway, for a few days in March 2015, adding 155 miles to the RV for the Phoenix trip and test drives. [DE 88-3 at 383–84]. In his Affidavit, Reger avers that he thought he was purchasing a "new" RV but received an RV with defects suggesting that it was not "new." [Id. at 374, 376].

ARV argues that the RV qualifies as a "new motor vehicle" as defined by Ariz. Rev. Stat. Ann. § 28-4301 and the display at the Phoenix Speedway does not disqualify it as a "new" vehicle. The statute defines "new motor vehicle" as "a motor vehicle, other than a used motor vehicle, that is held either for: (a) Sale by the franchisee who first acquired the vehicle from the manufacturer or distributor of the vehicle [or] (b) Sale by another franchisee of the same line-make." Ariz. Rev. Stat. Ann. § 28-4301(23). Used motor vehicles are further defined as "a motor vehicle that has been sold, bargained, exchanged or given away or the title to the motor vehicle has been transferred from the

64

person who first acquired the vehicle from the manufacturer, or importer, dealer or agent of the manufacturer or importer, and that has been placed in bona fide consumer use." Ariz. Rev. Stat. Ann. § 28-4301(34).

Here, Reger has not presented any evidence that the RV was not statutorily "new." There is no evidence that ARV transferred title of the RV to anyone but Reger. Moreover, Reger has not presented evidence that the RV was "sold, bargained, exchanged or given away" before he purchased it. Cf. *Schmidt v. Mel Clayton Ford*, 601 P.2d 1349, at 1351 (Ariz. Ct. App. 1979) (determining that there was a question of fact as to whether the vehicle at issue was "new" under the statute because the vehicle had been previously sold to other purchasers but was returned to the dealer without a change in title). Had Reger actually provided evidence that the RV had been used extensively as a demonstrator by ARV, there might have been a question of fact as to whether the RV was "new." See *Smith v. TMC Acquisitions, LLC*, 2006 WL 2613426, at *5 (D. Ariz. June 22, 2006) (finding a question of fact as to whether a motorcycle was "new" when it was undisputedly used as a demo unit by the dealership's manager for over 1,000 miles). But he did not. The record only shows that ARV attempted to sell the RV by displaying it at its lot and at the Phoenix International Speedway and by allowing test drives. Those reasonable efforts only amounted to 155 miles additional miles. As such, no rational trier of fact could find for Reger on this ACFA claim on the newness of the RV. See *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Accordingly, ARV is entitled to summary judgment on the newness claim.

b.       Inspection

To prevail under the ACFA, "a plaintiff must demonstrate that the defendant voluntarily intended to do the acts performed." *Powers v. Guaranty RV, Inc.*, 278 P.3d 333, 338 (Ariz. Ct. App. 2012). Here, Reger has not designated evidence to establish a question of fact as to ARV's intent to sell him a comprehensive, pre-delivery inspection ("PDI") but not perform the inspection.

Reger clearly believes that ARV agreed to inspect the RV before he took delivery of it. [*See* DE 88-3 at 375–76, ¶¶ 25–28]. ARV's service records include references to a PDI as well. [*See Id.* at 20 (an ARV Work Order dated August 21, 2015, instructing the technician to "make sure unit is presentable and everything works"); *Id.* at 243 (A "Deal[er] Recap Report" dated August 21, 2015, including a $1,295.00 charge on Reger's transaction for "PDI/DEL/DOC")]. The Purchase Agreement also suggests that ARV agreed to examine the RV in some way before delivering it to Reger. [*Id.* at 2 (including a $1,295.00 charge for "Dealer Preparation Fee" and specific notes of "PREP FOR DELIVERY; DETAIL OUTSIDE BUFF OUT SWIRLS; FULL FUEL; NO OTHER PROMISES MADE")].

With that said, no party disputes that a comprehensive inspection never happened. ARV contends that it had no obligation to conduct a comprehensive inspection as it only agreed to "prep" the RV for delivery. Reger relies on his own testimony that ARV's Williams later told him the inspection did not happen and that ARV fired the individual who failed to do so. [DE 88-1 at 105]. But all this evidence shows that ARV intended to perform some kind of examination of the RV before

66

delivering it to Reger. Even ARV's firing the person who failed to complete the inspection evidences ARV's intent to complete the inspection. No evidence even suggests that ARV intended to take Reger's money for an inspection and never complete it. Without such evidence of fraudulent intent, Reger cannot succeed on his statutory consumer fraud claim based upon the PDI he expected. As such, ARV is entitled to judgment as a matter of law on the PDI part of his ACFA claim.

### c.      Pre-Sale Accident

Reger's ACFA claim alleges "on information and believe [sic]" that "the RV was involved in a pre-sale accident, that damaged its front end, resulting in structural misalignment of its body and paint issues (including "orange peel" condition)." [DE 52 at 10–11, ¶ 65]. He then alleges that ARV did not tell him about this "pre-sale damage." [Id.]. Under the ACFA, "[t]he . . . omission of any material fact with intent that others rely on such concealment, suppression, or omission . . . is . . . an unlawful practice" ("the Omission Clause"). Ariz. Rev. Stat. Ann. § 44-1522. Yet Reger has not presented sufficient evidence to establish a genuine dispute of material fact as to whether a pre-sale accident even occurred let alone whether ARV failed to disclose it.

According to the affidavit of Thor's Technical Manager Mark Stanley, cited by ARV, he found some damage related to the use of Reger's RV when he inspected it in November 2017. However, Stanley also stated that he "saw no evidence of any significant accident that occurred with the RV prior to sale and the records of Thor Motor Coach and Arizona RV do not demonstrate any such pre-sale accident." [DE 82-5

at 6]. Reger, on the other hand, directs the Court's attention to documents, presumably produced by ARV in discovery, that he concludes were

> created and produced by ARV related to the inspection of the RV (pre-sale to Reger) at the "Camping World Collision Center" between July 20, 2015 and August 17, 2015 that indicate that the RV had stress cracks, scratches, imperfections, and the steering was out of alignment . . . that may have been caused by an "impact", . . . along with evidence of "overspray" to conceal damage.

[DE 88 at 16]. Reger's entire statement here is important because it is incomplete or inaccurate in more than one way.

All seven documents cited reflect repairs to scratches, stress cracks, paint, alignment, and other assorted issues with Reger's RV between July 20, 2015, and September 2, 2015. [DE 88-3 at 13, 34, 51–52, 68, 70, 151]. However, only two of the documents refer to "Camping World Collision Center" despite the implication from Reger that all the documents were from the Collision Center. [*See Id.* at 68, 70]. Three of the documents are dated after August 17, 2015 — the latest date Reger cited — and one is dated after Reger purchased the RV. [*Id.* at 13, 51, 151]. But none of the documents provide any context to confirm their purpose despite Reger's speculation that they were "created and produced . . . related to the inspection of the RV (pre-sale to Reger) . . . ." Two documents list the cause of three scratches as "impact" even though Reger implies that all the problems listed in those documents, or possibly in all seven documents, "may have been caused by an 'impact'." [*Id.* at 68, 70]. And lastly, two documents mention "overspray" related to paint issues but neither suggest that the overspray was used "to conceal damage" as Reger assumes. [*Id.* at 34, 52].

Aside from his unsupported assertions about the meaning of the seven documents he cites, Reger presents no evidence linking the assorted issues with his RV to a pre-sale accident or rebutting Mr. Stanley who averred that there was no pre-sale accident. At this "put up or shut up" stage of litigation, the Court would have expected easily accessible evidence such as Rule 30(b)(6) testimony from ARV, deposition testimony from the individuals named on the documents Reger cites, or even expert testimony connecting these pre-sale repairs to a pre-sale accident. With nothing more, Reger has not created a genuine dispute of material fact as to the pre-sale accident and cannot survive summary judgment on this ACFA claim.

### d.   Frame Rail Extension

Reger's claim that ARV violated the ACFA by failing to disclose the frame rail extension by Thor during assembly is also governed by the ACFA's Omission Clause. *See* Ariz. Rev. Stat. Ann. § 44-1522. To prevail on a claim under the Omission Clause, a plaintiff must prove "that the omission is material and made with intent that a consumer rely thereon." *State ex rel. Horne v. AutoZone, Inc.*, 361, 275 P.3d 1278, 1281 (Ariz. 2012) (en banc). Reger fails to designate evidence of such intent to mislead with regard to the frame rail extension.

It is significant to note that both Dr. Grismer, Reger's own expert, and Mark Stanley, Thor's Technical Manager who inspected Reger's RV in November 2017, agree that frame rail extensions are routinely done in the industry and can be performed without affecting the frame's strength. [DE 82-4 at 51–52; DE 82-5 at 2]. The parties' dispute, however, focuses on whether Thor's extension of the frame rails on Reger's RV

69

was done properly. Even if the frame rail extension was defective in some way, the question relevant to Reger's claim based on the AFCA's Omission Clause is whether ARV failed to disclose the defective frame rail extension intending for Reger to rely upon that omission. *See* Ariz. Rev. Stat. Ann. § 44-1522. Clearly, ARV could only fail to disclose a defective frame rail extension if it knew the extension was faulty or had caused other damage to the RV. The evidence Reger relies upon demonstrates no such knowledge of the defective extension.

Reger directs the Court to documentation provided to ARV by Thor at the time of purchase from Thor, which includes the invoice, certificate of origin of the RV, and a listing of standard equipment on the RV. [DE 88-3 at 332–37]. Reger suggests, without specifying how, that these documents establish ARV's knowledge of the frame rail extension. On its own review of the cited documents, the Court found reference to "Chassis Upgrade—Increase HP[31] to 450." [*Id.* at 332]. This may have put ARV in a position to know that the frame rails had been extended, but nothing in the documents even hints at a defective extension. Reger's report that ARV told him nothing was wrong with the RV also fails to support any conclusion that ARV knew the extension was done poorly or improperly. [*Id.* at 375, ¶¶ 23–24]. And any knowledge that owners of the RV model Reger purchased were generally unhappy does not equate to knowledge of a defective frame rail extension. [DE 88-4 at 5].

---

[31] Review of these documents was particularly challenging given the poor quality of the electronic version of the document. The Court could only guess that the notation between the words "Increase" and "to 450" was "HP." [DE 88-3 at 332].

Rather than confront the dearth of evidence for his claim under the AFCA's

Omission Clause, Reger argues that ARV failed to comply with another Arizona statute,

which establishes a legal duty for dealers to disclose, in writing, its knowledge that a

new vehicle has been damaged or repaired if the damage exceeds 3% of the

manufacturer's suggested retail price. *See* Ariz. Rev. Stat. Ann. § 28-4411(A)(2). This

argument also fails because Reger has not produced evidence that ARV knew of the

defective frame rail extension before the sale of the RV.

With no dispute of material fact, ARV is entitled to judgment as a matter of law

on Reger's AFCA claim for failing to disclose the defective frame rail extension.

### e.    Chassis Warranty

In his Complaint, Reger alleges that ARV violated the ACFA by

> falsely represent[ing] to Plaintiff that the RV came with a chassis
> warranty, and conceal[ing] from him that the frame rail portion of that
> warranty was voided by the chassis manufacturer, because of the frame
> rails' modifications. Plaintiff first learned about this fraud on January 11,
> 2019, during the 30(b)(6) deposition of the chassis manufacturer's
> [Freightliner's] representative.

[DE 52 at 11, ¶ 66]. ARV's exact representation about the Freightliner chassis warranty

is not clear from the parties' designated evidence. What is clear, however, from

Freightliner's 30(b)(6) testimony by Dennis Rostenbach on January 11, 2019, is that

"[a]ny modification to [the] frame rails is not recommended, and voids the warranty."

[DE 88-4 at 51]. Rostenbach also testified: "If a chassis' rails were cut and stretched,

Freightliner still honors the chassis warranty. The only thing that's excluded is the

frame rails themselves." [*Id.* at 19]. No one disputes that the frame rails were modified

by Thor. Important here, however, is what—if anything—ARV told Reger about the frame rails portion of the Freightliner warranty at the time of purchase.

The only evidence of any representation by ARV about the Freightliner warranty at the time of purchase comes from Reger's Affidavit, prepared on January 10, 2020, stating: "While negotiating to purchase the RV, Shawn Williams represented to me that the RV came with a Freightliner warranty that covered the chassis/frame." [DE 88-3 at 374, ¶ 17]. This statement seems consistent with part of Reger's deposition testimony from August 14, 2019:

> Q: Outside of the service contract . . . and this bumper to bumper warranty that you understood you were getting from Camping World and Thor, were you aware of any other warranties on the motor home at the time you purchased it?
>
> A: I believe Freightliner covered the engine portion of it for a period of time.

[DE 82-1 at 54]. Yet in response to a follow-up question, Reger is far less certain, if not completely uncertain, as to whether he knew about the Freightliner warranty at the time of purchase:

> Q: So at the time you purchased the RV, you understood that there were certain things that would be covered by a Freightliner warranty and other things that would be covered by this Thor/Camping World warranty?
>
> A: At the time—your is question is at the time I purchased it. It's a little confusing for me. All the years of knowing what I know now, I'm trying to figure out what I knew then. So I need to think it through.
> At the time I purchased it, I believe that the warranty was through Camping World and then they would do whatever needed to be done to service the coach for whatever warranty issue arose.

[*Id.* at 54–55]. As a result, Reger's Affidavit contradicts his earlier deposition testimony. "Affidavits . . . offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). Reger has offered no plausible explanation for this discrepancy.

Rather, in response to ARV's instant motion for summary judgment, Reger relied upon his contradictory affidavit statement when he asserted in his Statement of Genuine Disputes that "ARV represented to Reger that the RV came with a Freightliner warranty that covered the chassis/frame." [DE 88 at 2 (citing DE 88-3 at 374, ¶ 17]. ARV asks that the Court strike this factual assertion because it contradicts his previous deposition testimony. Given the insufficiently explained contradiction between the affidavit and the deposition testimony, neither Reger's factual assertion in his Statement of Genuine Disputes nor paragraph 17 of his Affidavit is entitled to any weight. *See Beckel*, 301 F.3d at 623. However, the Court need not strike the factual assertion as requested to properly disregard the contradictory affidavit statement.

Without paragraph 17 of Reger's Affidavit, there is no evidence of any representation to Reger about the Freightliner warranty. Without evidence of a representation of any kind, there is no evidence of a misrepresentation. Accordingly, Reger has not designated evidence that creates a genuine dispute of material fact as to whether ARV "falsely represented [] that the RV came with a

chassis warranty" as he alleges in his Complaint. [*See* DE 52 at 11, ¶ 66].

Moreover, he cannot. The RV came with a chassis warranty from Freightliner.

Reger even acknowledges attempting to make a claim for rust and corrosion

damage under Freightliner's warranty. [DE 82-1 at 60–61].

Reger also alleges that ARV "concealed from him that the frame rails portion of

Freightliner's warranty was voided by the chassis manufacturer, because of the frame

rails' modifications." [DE 52 at 11, ¶ 66]. Thor has admitted that the frame rails were

modified. [DE 88-4 at 118]. Freightliner's representative, Dennis Rostenbach, also

testified that any modification of the frame rails voids its frame rail warranty. [*Id.* at 51].

Even if ARV knew that the frame rails had been extended and that the frame rails

portion of Freightliner's chassis warranty was voided as a result, Reger still has not

presented any evidence from which a justifiable inference could be made that ARV

concealed the warranty information to defraud or mislead Reger as required to

establish an ACFA claim under the Omission Clause. *See* Ariz. Rev. Stat. Ann. § 44-1522;

*State ex rel. Horne*, 275 P.3d at 1281; *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 158–59 (1970). Frankly, he has not designated any evidence to

demonstrate that ARV was aware that the frame rail modification affected Freightliner's

warranty. Therefore, ARV is also entitled to judgment as a matter of law on Reger's

chassis warranty claim under the ACFA.

### 4.    Common Law Fraud (Count VII)

In his Complaint, Reger alleges that ARV "knowingly engaged in common law

misrepresentation and fraudulent concealment" with seven different actions by ARV's

salesman on August 21, 2015. [DE 52 at 11, ¶ 69(a), (c)]. Reger alleges that ARV made false representations regarding matters material to Reger's purchase of the RV and concealed those material facts despite having a duty to disclose them. [*Id.*, ¶ 69(e)]. Specifically, Reger alleges:

> (1) false representation that the RV came with a chassis warranty; (2) concealment that the warranty was voided by the chassis manufacturer; (3) concealment that the chassis was cut, extended, and badly welded, in violation of the chassis manufacturer's directions; (4) charging a fee to perform an inspection, and not inspecting the RV; (5) falsely representing that the RV was "new"; (6) concealing the prior use of the RV which made it "not new"; (7) concealment of the rust on the supposedly "new" RV . . . .

[*Id.*, ¶ 69(b)]. Based on these allegations, Reger now argues that ARV's conduct amounts to both constructive and actual fraud. ARV contends that all of Reger's common law fraud claims, except the rust concealment claim, duplicate his ACFA claims and fail for the same reasons—no evidence of misrepresentation, knowing misrepresentation, or intent to mislead. Similarly, ARV contends that there is no evidence that it knew of alleged rust or acted intentionally to prevent Reger from finding the truth. Thus, ARV argues that it is entitled to judgment as a matter of law on all seven of Reger's common law fraud claims.

In Arizona, there are "three distinct classes of fraud: misrepresentation, concealment, and non-disclosure." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 34 n.22 (Ariz. 2002) (en banc) (citing Restatement (Second) of Torts § 525 (fraudulent misrepresentation); § 551 (nondisclosure); § 550 (fraudulent concealment)). Misrepresentation and concealment are distinguished by the requirement of intent, which is not required to establish

fraudulent nondisclosure, also called constructive fraud. *Id.*; *see also Dawson v. Withycombe*, 163 P.3d 1034, 1057 (Ariz. Ct. App. 2007) (defining constructive fraud as "a breach of legal or equitable duty which, without regard to moral guilt or intent of the person charged, the law declares fraudulent because the breach tends to deceive others, violates public or private confidences, or injuries public interests."). Fraud of any type must be established by clear and convincing evidence. *Well Fargo Bank*, 38 P.3d at 36 n.24; *Universal Inv. Co. v. Sahara Motor Inn, Inc.*, 619 P.2d 485, 486 (Ariz. Ct. App. 1980).

Reger's Complaint explicitly raises two fraudulent misrepresentation claims and four fraudulent concealment claims. Reger's seventh claim for "charging a fee to perform an inspection, and not inspecting the RV" does not clearly explicitly fall into any of the three categories of common law fraud but is consistent with either a misrepresentation or concealment claim. In response to ARV's motion for summary judgment, Reger argues that ARV should also be held liable for concealment of rust claim under the theory of constructive fraud, or non-disclosure.

### a.    Fraudulent Misrepresentation

Consistent with the standard stated in *Haisch*, 5 P.3d at 944, "[l]iability for fraudulent misrepresentation . . . lies against one who fraudulently makes a misrepresentation of fact for the purpose of inducing another to act or to refrain from action." *Wells Fargo Bank*, 38 P.3d at 34 n.22. (internal citations and quotations omitted). In discussing Reger's parallel AFCA claim, this Court has already found—based on the record before it—that the RV came with a chassis warranty such that any representation

that it did would be truthful. *Supra*, at 73. Accordingly, Reger's fraudulent misrepresentation claim as to the chassis warranty necessarily fails.

Similarly, this Court already found that the record lacks evidence that the RV was not statutorily "new." *Supra*, at 64. As such, no rational trier of fact could find for Reger on this fraudulent misrepresentation claim either.

And lastly, this Court found that Reger did not present evidence of any intent on ARV's part to sell him a comprehensive inspection but then not perform it. *Supra* at 66. In fact, the evidence before the Court only establishes an intent to perform the inspection. Any fraudulent concealment claim based upon the inspection also fails because there is no evidence of the necessary intent. Thus, ARV is entitled to judgment as a matter of law on any actual fraud claims arising from Reger's allegations related to the inspection.

### b. Fraudulent Concealment

Fraudulent concealment arises when "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information." *Wells Fargo Bank*, 38 P.3d at 34. To prevail on his fraudulent concealment claims, Reger must therefore establish—by clear and convincing evidence—that ARV (1) knew of the alleged false information, and (2) acted to intentionally prevent him from finding the truth. *See id.* at 36 n.24. In discussing Reger's ACFA claim for concealing the voided warranty, this Court found that Reger presented no evidence "from which a justifiable inference could be made that ARV concealed the warranty information to defraud or mislead Reger . . . ." *Supra*, at 74. In other words, the record

lacks evidence that ARV intentionally prevented Reger from acquiring information as to the voiding of frame rails portion of Freightliner's chassis warranty. Thus, this fraudulent concealment claim fails.

Reger's claim that ARV fraudulently concealed that the "chassis was cut, extended, and badly welded, in violation of the chassis manufacturer's directions" also fails. First, the entire chassis was not cut, extended, or badly welded. The record clearly establishes that the frame rails—as part of the chassis—were cut and extended. Whether the frame rails were badly welded, however, remains a question of fact. Second, this Court already found that even if ARV knew that the frame rails had been extended, Reger designated no evidence that ARV knew that the frame rail extension was defective in any way, including bad welds. *Supra*, at 70. Without knowledge as to the quality of the frame rail extension, ARV could not have fraudulently concealed the allegedly defective frame rail extension. And lastly, ARV cannot be held liable under common law fraud for failing to conceal the mere fact that the frame rails were cut and extended because the record lacks evidence of any intent on ARV's part to prevent Reger from learning of the extension.

As to prior use, or the newness, of the RV, the Court has already concluded that "Reger has not presented any evidence that the RV was not statutorily 'new.'" *Supra*, at 64. Thus, ARV's pre-sale use of the RV at the Phoenix International Speedway and on test drives were reasonable efforts that no rational trier of fact could find changed the "new" condition of the RV. As such, there was no material prior use for ARV to disclose. And again, Reger presents no evidence of any intent on ARV's part. Therefore,

Reger's fraudulent concealment claim based on the prior use of the RV, or its "newness," also fails.

Lastly, Reger alleges that ARV fraudulently concealed rust on the RV. Reger seems to contend that ARV knew of the rust from its inspection of the RV. Yet the record shows that no comprehensive inspection of the RV was performed. Reger also contends that Shawn Williams told him there was nothing wrong with the RV suggesting that there was no rust to disclose. Yet Reger presents nothing to show that Williams knew of the rust. Without evidence that ARV knew of the rust pre-sale, Reger cannot establish a fraudulent concealment claim.

### c.   Constructive Fraud

Reger's primary argument that his rust concealment claim should survive ARV's motion for summary judgment is based on the theory of constructive fraud, which is consistent with the nondisclosure category of fraud.[32] A party is liable for nondisclosure when it fails to disclose a fact, but only if there is a duty to disclose the matter in question to another. *Wells Fargo Bank*, 38 P.3d at 34 n.22. As such, concealing the material fact that the RV was plagued by rust despite a duty to disclose, as Reger alleges here, can be actionable fraud even without a showing of intent to deceive or dishonesty

---

[32] ARV argues that constructive fraud is not before the Court because Reger's Complaint includes no reference to a representation by ARV that the RV was "defect free." [DE 96 at 15 n.10]. ARV's argument is misplaced because Reger's Complaint expressly alleges that "ARV was under a duty to disclose to Plaintiff the true facts, because Defendant engaged not in mere silence in the transaction, but its silence was accompanied by the deceptive conduct (such as commendation of the RV's qualities) and by suppression of material facts." [DE 52 at 12, ¶ 71]. Reger may not have used the phrase "defect free" in his allegations, but "commendation of the RV's qualities" incorporates the "defect free" concept. Thus, Reger's constructive fraud, or non-disclosure, argument is properly before the Court.

of purpose as required for fraudulent concealment. *See Dawson*, 163 P.3d at 1057; *Universal Inv. Co.*, 619 P.2d at 486. To succeed on the claim, Reger must show a fiduciary or confidential relationship, a breach of the duty to disclose by a person in that relationship, and justifiable detrimental reliance on the breach. *Dawson*, 163 P.3d at 1057.

Though generally no duty to disclose exists between a buyer and seller, such a duty arises under certain circumstances. *Powers v. Guaranty RV, Inc.*, 278 P.3d 333, 340 (Ariz. Ct. App. 2012). For instance, "[w]hen a buyer inquires about a certain condition, a seller has the duty to disclose all he knows" in order to correct any earlier misrepresentation. *Id.* Relying upon his Affidavit and the ARV Work Order to "make sure unit is presentable and everything works," Reger contends that such a duty to disclose arose for ARV either when he asked Shawn Williams if there was anything wrong with the RV during negotiations prior to the sale or when he paid for a comprehensive pre-delivery inspection of the RV. Assuming that such a duty did arise, Reger has not designated evidence to establish the breach necessary to overcome ARV's instant Motion.

According to Reger, ARV breached its duty to disclose the rust when Williams told him there was nothing wrong with the RV despite knowing about the rust before the sale; when ARV failed to disclose its discovery of the rust during the comprehensive inspection; or when ARV failed to disclose the rust by lying about performing the inspection. Yet Reger designates nothing to show that ARV knew about the rust on the RV when Williams told him there was nothing wrong with the RV. Additionally, ARV

could not disclose anything about the condition of the RV from the comprehensive inspection that all parties agree did not happen. And lastly, Reger's Affidavit states that he was "informed that the inspection showed that [the] RV was in great condition and that everything was working perfectly." [DE 88-3 at 376, § 28]. However, Reger failed to "put up" any evidence to show that anyone at ARV knew about the rust at the time of this alleged representation. Without more, Reger has not established even a dispute of fact as to a breach of any duty to disclose. As such, he cannot prevail on his constructive fraud claim.

Finding no genuine disputes of material fact regarding any of Reger's claims against ARV, ARV is entitled to judgment as a matter of law on all the claims.

## III. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** Thor's Motion for Summary Judgment [DE 79]. Thor is entitled to judgment as a matter of law on: (1) all claims for Breach of Express Warranty Claim under the Magnuson Moss Warranty Act (Count II); (2) the Rust Claim under the Indiana Deceptive Consumer Sales Act (Count III); and (3) the Common Law Fraud Claim (Count VIII). Additionally, the Court **GRANTS** ARV's Motion for Summary Judgment [DE 81] on all claims.

The Court **SETS** a telephonic scheduling conference for **Tuesday, February 9, 2021**, at **11:45 a.m. (E.S.T.)** for the purpose of scheduling a trial for the remaining claims against Thor under the IDCSA. To connect to the conference, parties should dial 877-336-1828, and enter access code 5433302# at least five minutes before the conference start time.

    **SO ORDERED** on this 26th day of January, 2021.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge
